**NETWORK ENTERPRISES, INC., Plaintiff–Appellee,**

v.

**APBA OFFSHORE PRODUCTIONS, INC. and Michael D. Allweiss, Defendants–Appellants.**

No. 06–5094–cv.

United States Court of Appeals, Second Circuit.

Feb. 11, 2008.

W. Donald Cox (Hala Sandridge, on the brief) Fowler White Boggs Banker, PA, Tampa, Florida, for Appellants.

William B. Fleming, Gage Spencer & Fleming, LLP, New York, New York, for Appellee.

PRESENT: Hon. SONIA SOTOMAYOR, Hon. DEBRA ANN LIVINGSTON, Circuit Judges, Hon. GREGORY W. CARMAN,[1] Judge.

1. The Honorable Gregory W. Carman of the United States Court of International Trade, sitting by designation.

## SUMMARY ORDER

Defendants–Appellants APBA Offshore Productions, Inc. ("Productions") and Michael D. Allweiss appeal principally from the April 20, 2006 final decision of the Southern District of New York (Haight, J.), following a bench trial, directing judgment in favor of Plaintiff–Appellee Network Enterprises, Inc. ("Network"). We assume familiarity with the facts and procedural history.

After a bench trial, the Court reviews the district court's findings of fact for clear error. FED.R.CIV.P. 52(a); *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir.2001). Legal conclusions are reviewed *de novo. Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir.1996).

Defendants contend primarily that the district court erred in concluding that the parties entered into a Type II preliminary agreement when Productions exercised its option pursuant to the Renewal Option Rider ("ROR") to the August 21, 2000 Time Buy Agreement ("TBA"). The considerations relevant to whether a binding Type II agreement exists are: (1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) whether there was partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions. *Brown v. Cara,* 420 F.3d 148, 157 (2d Cir.2005). We agree with the district court that these factors indicate the existence of a binding Type II agreement between Network and Productions.

First, the ROR granted Productions the option to purchase up to thirteen episodes for the 2001 season. It provided also that "[t]he dates and times of such telecasts shall be mutually agreed to by the parties hereto." A.40. This language suggests that once Productions exercised its option, the parties contemplated that they were bound to "work out the details" of the 2001 broadcast season.

Second, leading up to the exercise of the renewal option, the parties began discussing the possibility of entering into a new deal not contemplated by the TBA. Brian Hughes of Network told Allweiss that the renewal option could be a "fall back" if the new deal fell through. A.274. Allweiss never expressed any dissatisfaction with this arrangement to Network. And on March 1, 2001, the last day the option could be exercised, Allweiss caused Productions to exercise the option. A.275. These facts, when viewed objectively, *see Klos v. Polskie Linie Lotnicze,* 133 F.3d 164, 168 (2d Cir.1997) (objective manifestation of parties' intent guides contract interpretation), are consistent with the conclusion that the parties believed they would negotiate under the ROR's framework if the new deal was not consummated.

Third, the ROR left open the number, dates, and times of telecasts to be made during the 2001 season. It supplied a price term and an upper limit on the number of episodes. A.40. All remaining terms were covered by the TBA. This supports the conclusion that the parties created a general framework in which to work, with the expectation that they later would agree on the details of precisely when to broadcast Productions' shows. "[W]here the existence of open terms creates a presumption against finding a binding contract as to the ultimate goal, these same omissions may actually support finding a binding Type II agreement." *Brown,* 420 F.3d at 158 (citations omitted). This is so even where the open terms are "critical to every aspect" of the parties' ultimate contractual objective. *See id.*

Fourth, the evidence shows that Network partially performed by reserving air time for Productions' shows. A.188–89. The district court reasonably found that Network did this because Hughes had a legitimate basis to believe that the parties, pursuant to the ROR, had agreed to the terms contained in the August 7, 2001 proposal sent to Allweiss by Mary Beth Pacisi. A.584–85.

Finally, there is no evidence in the record from either side indicating whether the broadcasting industry generally views preliminary agreements to negotiate in good faith to be binding. Accordingly, this last factor has little weight in our analysis.

Defendants' remaining arguments challenging a finding of a Type II agreement are without merit. Assuming, *arguendo*, that the district court's statement in its summary judgment order that no binding agreement to agree had been formed had established the law of the case, the district court reasonably strayed from the law of the case to correct a clear error or prevent manifest injustice in light of the ample evidence adduced at the bench trial establishing the existence of a Type II agreement. *See United States v. Becker*, 502 F.3d 122, 127 (2d Cir.2007). Furthermore, defendants conceded at oral argument that they were not prejudiced by the district court's earlier statement.

Defendants complain that the pleadings did not allege the existence of a Type II agreement. They did not object to trying this issue, however, and both parties addressed it in their trial briefs. A.517–23, 543–49. Given these facts, the preliminary agreement issue properly may be "treated in all respects as if [it] had been raised in the pleadings." Fed.R.Civ.P. 15(b)(2).

■ Defendants next claim that there was no breach of any Type II agreement because Allweiss earnestly sought to enter into some kind of new arrangement for the 2001 broadcast season and therefore acted in good faith. This is unavailing. The ROR imposed the obligation to negotiate in good faith within its general framework toward the contractual goal it contemplated. *Brown*, 420 F.3d at 153. Negotiating outside of that framework did not discharge defendants' duty to negotiate within it as well.

■ Defendants also challenge the district court's damages calculation. This Court is especially deferential to a district court's damages finding, however, *see Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir.1996), and we see no reason to disturb the finding here. Defendants argue that the $400,000 damages figure is inappropriate because defendants cannot be held liable as though a final agreement to purchase ten episodes at $40,000 per episode had been consummated and breached. But the district court did not base its damages finding on a conclusion that the parties formally had agreed to a ten-episode deal at $40,000 per episode. Rather, the court found that Productions acted in bad faith by leading Network to believe that the parties were on the brink of consummating such a deal, causing Network to set aside air time for Productions' programming, and then backing out at the last minute—nine days before the first scheduled telecast—when Network had no profitable alternative programming to fill the time slots. The court therefore did not hold Productions liable for failing to buy air time pursuant to a formal purchase agreement. It held Productions liable for ceasing negotiations in bad faith, thereby proximately causing Network to lose air time that the parties agreed was valued at $400,000. A.589.

Finally, defendants argue that the district court should not have pierced the

corporate veil to hold Allweiss personally liable for Productions' actions.

█ To pierce the veil in New York, a plaintiff must show "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997). To pierce the corporate veil under Florida law, a plaintiff must show that the corporation is a mere instrumentality or *alter ego* of the defendant and that the defendant engaged in "improper conduct." *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1320 (11th Cir.1998) (citing *Dania Jai–Alai Palace, Inc. v. Sykes*, 450 So.2d 1114, 1117–21 (Fla.1984)). As we conclude that veil piercing is warranted in this case under either standard, we do not reach the questions of whether a conflict of law exists and if so, which law should apply.

There appears to be no serious dispute that Allweiss dominated Productions, as he: (1) formed the company; (2) at all times served as its sole owner and member; (3) conducted all of its business, including maintaining the corporate bank account, signing the TBA, exercising the renewal option, and causing the company to cease negotiations under the ROR; and (4) operated the company from the same address where he maintained his law practice. Furthermore, Allweiss removed money from Productions' account and left the company insolvent before he caused it to sign the TBA and exercise the renewal option under the ROR. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 18 (2d Cir.1996) ("insolvency at the time of a transaction" and "siphoning off of funds by the dominant shareholder" are relevant to veil piercing consideration); *Ocala Breeders' Sales Co. v. Hialeah, Inc.*, 735 So.2d 542, 543 (Fla.Dist.Ct.App.1999) (same). By the time of the transactions at issue here, Productions had the markings of a shell corporation dominated by Allweiss.

The real question therefore is whether there was sufficiently wrongful conduct to warrant corporate disregard. The district court found that APBA Offshore Power Boat Racing, LLC (the "LLC") was formed in February 2000 and the following month acquired a license from the APBA to televise powerboat races. Productions became obsolete, and Allweiss emptied the company's bank account. Nevertheless, in August 2000, Allweiss caused Productions to sign the TBA and undertake obligations that it could not and did not intend to discharge, while he neglected to tell Network about the existence of the LLC.

These actions were deceptive, notwithstanding Allweiss's claim that he did not believe he was doing anything wrong. The TBA was intended to memorialize Network's earlier "handshake agreement" with Productions. Furthermore, Network had successfully contracted with Productions in the past when that company was fully capable of undertaking contractual duties and willing to perform them. Network therefore had every reason to believe in August 2000 that Productions was willing and able to perform under the TBA, and therefore the appropriate party to sign the contract. That, of course, is why it drafted the TBA to list Productions as the "Purchaser," A.27, and thought it entirely appropriate that Allweiss signed in Productions' name, A.28. Allweiss did nothing to dispel Network's beliefs about Productions' ability and willingness to perform, which he knew were no longer accurate.

The case of *Ocala Breeders' Sales Co. v. Hialeah, Inc.*, 735 So.2d 542, is instructive.

The plaintiff there 2d 542, is instructive. The plaintiff there sued Hialeah Park, a wholly-owned subsidiary of, for breach of contract. The plaintiff subsequently learned that Hialeah Park had no assets to satisfy the judgment, and so sued Hialeah, Inc. as Hialeah Park's *alter ego*. A Florida court held that Hialeah, Inc.'s complete domination of Hialeah Park and Hialeah Park's lack of assets at the time it entered into the contract were sufficient to warrant veil piercing. *See id.* at 543–44 ("Hialeah Park entered into the agreement even though it did not have the ability to fulfill the contract. As such, Hialeah Park fraudulently mislead Ocala Breeders'."); *see also Se. Capital Invest. Corp. v. Albemarle Hotel, Inc.*, 550 So.2d 49, 51 (Fla. Dist.Ct.App.1989) (causing company to enter into contract without present ability or expectation of ability to perform is sufficiently wrongful for veil piercing purposes).

We are persuaded also that Allweiss's misrepresentations and omissions caused injury to Network. In being deceived about Allweiss's intention to have the LLC instead of Productions perform under the TBA, Network was denied the opportunity to weigh the pros and cons of contracting with the new company, with which it had no previous experience, which had a different capital structure and management team than Productions, and which had a different licensing arrangement with the APBA. Accordingly, by being induced to contract with the wrong party, Network was denied the opportunity to dicker for different contractual terms, including seeking a guarantee, based on the different risks it potentially faced.

In the last analysis, the record here supports the conclusion that Allweiss abused the corporate form to Network's detriment by deceiving Network about Productions' willingness and ability to perform under the TBA. Accordingly, we see no error in the district court's decision to pierce Productions' corporate veil to hold · Allweiss personally liable for his company's breach.

For these reasons, the judgment of the district court is hereby **AFFIRMED**.