LEGO A/S, and Lego Systems, Inc., Plaintiffs,

v.

BEST–LOCK CONSTRUCTION TOYS, INC., Defendant.

No. 3:11–CV–1586 (CSH).

United States District Court, D. Connecticut.

Aug. 20, 2012.

Catherine Dugan O'Connor, Day Pitney LLP, Stamford, CT, Elizabeth Ann Al-

quist, Nicholas A. Pisarsky, Day Pitney LLP, Hartford, CT, for Plaintiffs.

Arthur C. Cody, Douglas A. Miro, Robert C. Faber, Stephen J. Quigley, Ostrolenk Faber LLP, New York, NY, Dena M. Castricone, Murtha Cullina, New Haven, CT, Michael J. Donnelly, Murtha Cullina LLP, Hartford, CT, for Defendant.

## RULING ON PLAINTIFFS' MOTION FOR LEAVE TO JOIN ADDITIONAL PARTIES

HAIGHT, Senior District Judge:

This is an action brought principally under the Copyright Act, with pendent state law claims. The copyrighted artifacts are manufactured plastic toys called "minifigures," designed to be attachable to construction blocks forming part of the toy. Plaintiffs and Defendant compete in global markets for the design, manufacture, distribution and sale of minifigures. Plaintiffs allege that minifigures made by Defendant infringe Plaintiffs' copyrights on minifigures they make. Defendant responds that Plaintiffs' copyrights are invalid, and that in any event Defendant is not liable for infringing them.

The parties have cross-moved for preliminary and permanent injunctions. The Court denied both motions without prejudice to renewal after discovery, in a Ruling reported at 874 F.Supp.2d 75, 2012 WL 2829454 (D.Conn. July 12, 2012) ("*Lego I*"). This Ruling addresses another motion: that of Plaintiffs, pursuant to Fed. R.Civ.P. 21, to join two additional parties, named as defendants in an amended complaint. One is a corporation, whose joinder is not opposed. The second is an individual, who opposes being joined in the action. This Ruling resolves Plaintiffs' disputed motion for an order joining that individual as a party defendant.

## I. BACKGROUND

The factual background of the case is stated in detail in *Lego I*, familiarity with which is assumed. The facts are recounted here only to the extent necessary to explicate the Court's ruling on the present motion.

### A. *Litigation History in the United States*

Plaintiffs Lego A/S and Lego Systems, Inc. (collectively "Lego") have manufactured and sold minifigures since 1978. Defendant Best–Lock Construction Toys, Inc. ("Best–Lock") has been selling its own minifigures in the United States since 1998. Best–Lock's minifigures have consistently over the years had an appearance very similar to that of Lego's minifigures, and are also used in child's play in the same manners. These corporate parties compete with each other directly in the American market for children's toys.

Notwithstanding the products' similarities and the parties' competition, litigation between them in the United States did not break out until October 14, 2011, when Lego filed this action against Best–Lock, alleging infringement by Best–Lock of Lego's minifigure copyrights registered in this country. That prolonged period of American non-combativeness differed from the rest of the world. Torsten Geller, CEO of Best–Lock since 2001, states in a reply affidavit supporting Best–Lock's motion for a preliminary injunction [Doc. 52–1] at ¶¶ 11–12: "Indeed, *since 1998, outside the United States*, I do not recall there being a single year when Best–Lock and Lego's lawyers have not been involved in litigation or threats of litigation concerning BestLock's products. *To the contrary, in the United States,* prior to this lawsuit, Best–Lock and Lego had never been involved in any litigation or threat of litigation, including but not limited to, any

litigation or threat of litigation involving the Lego minifigures." (emphases in original).

Whatever may have been the cause, unexplained by the present record, of that puzzling non-combat zone in the center of a commercial world at war, the strife of litigation spread to American shores shortly after the action of the U.S. Customs and Border Protection agency ("CBP"), which on July 14, 2011 carried out the first of a series of seizures of shipments from abroad of Best–Lock's minifigures and related toy blocks, on the stated ground that Best–Lock's minifigures infringed Lego's minifigure copyrights. There is no evidence that Lego requested CBP to take that action, or otherwise instigated it. Best–Lock petitioned CBP in writing to cease the seizures, and demanded that Lego assist it in doing so, all to no avail. On October 14, 2011, Lego filed its October 2011 infringement action in this Court, seeking to enjoin Best–Lock from manufacturing or selling its accused minifigures in this country.

Best–Lock responded to Lego's action with two pleadings of its own. First, on January 5, 2012, Best–Lock filed its answer and counterclaims in Lego's action in this Court, seeking declarations that Lego's minifigure copyrights are invalid, and an injunction seeking to put an end to CBP's seizures of Best–Lock's products. Second, by a complaint dated January 26, 2012, Best–Lock and two other related companies filed an action against Lego in the United States District Court for the Central District of California, seeking declaratory and injunctive relief comparable to that prayed for by Best–Lock's counterclaims in the case at bar in this Court. The plaintiffs in the California action are Best–Lock Construction Toys, Inc., a Florida corporation, the sole defendant in the case at bar and referred to herein as "Best–Lock"; and two Hong Kong corporations: Best–Lock Group Limited, Hong Kong; and Best–Lock Limited, Hong Kong. Best–Lock and Best–Lock Limited, Hong Kong are alleged to be subsidiaries of Best–Lock Group Limited, Hong Kong. Subsequent to its filing, this California action was transferred to this Court as related to the previously filed action commenced by Lego, and consolidated with it. [Doc. 62].

On February 21, 2012, Lego filed the present motion [Doc. 44] for a Court order granting it leave to add Best–Lock Limited, Hong Kong and Torsten Geller as additional party defendants in the captioned case. The inspiration for Lego's desire to add these parties, and the careful fashioning of the proposed claims against them, appears to be two interviews Geller gave to news publications in Hartford, Connecticut during the previous month of January 2012. I discuss the articles describing those interviews in Part I.B., *infra.* As previously noted, Best–Lock Limited, Hong Kong (hereinafter "Best–Lock Hong Kong") does not oppose being joined as an additional corporate defendant. The Court will grant leave accordingly, perceiving no reason not to do so. The issues requiring adjudication arise out of Lego's vigorous efforts to add Geller as an additional individual defendant, opposed by Geller with equal vigor.

## B. *The Geller Interviews*

The record shows that *The Hartford Courant* published an account datelined January 29, 2012 of an interview by a reporter, Mara Lee, of an interview with Torsten Geller. The article is captioned "Blocking and Tackling: A Nasty LEGO Copyright Battle." On or about the same day (January 29, 2012), according to Lego's main brief in support of its motion [Doc. 45] at 5, *The Hartford Business Journal* published an account of an inter-

view Geller gave to one of its reporters, Gregory Seay. Seay's article is captioned: "Lego Locked in Domestic Copyright Fight." Copies of these articles form Exhibits 4 and 3 respectively to Lego's motion papers.

These interviews are somewhat puzzling. An experienced and presumably sophisticated chief executive of international corporations, in the midst of litigation conducted by skilled trial lawyers paid handsomely to speak on the corporations' behalf in the carefully considered and nuanced language of the law, chooses journalists as the recipients of angry, personalized, solipsistic, judgmental condemnations of Lego and those who direct its business affairs. Some of the statements attributed to Geller in these interviews sound more like what one would say to one's therapist, rather than a newspaper reporter. " 'They lied to me as a kid,' " said Geller, who now resides in British Columbia, Canada. " 'That's why I started this business. It's a personal vendetta, yes.' " *Hartford Business* article [Doc. 45-3] at 5. In Geller's perception, Lego committed the cardinal sin of lying to trusting children when its Danish toymaker founders introduced the Lego line in 1958 without revealing that it was patterned on a British version created during World War II by the British inventor Hilary Page. Geller claims "that as a kid he was among Lego's biggest fans," and only learned "the plastic toy blocks originated in England in 1944, not Billund, Denmark, Lego's world headquarters" when, having moved to London after retirement from his first business and "searching for plastic blocks for his two young sons, he discovered a British shop selling ones that weren't Lego." *Id.* Geller reacts with fury. " 'They're crooks. They stole everything they have,' Geller said of Lego. 'They never invented a thing.' " The *Hartford Business* interview account concludes: "Meantime, Geller vows to continue his campaign to portray Lego as an unscrupulous bully bent on dismantling any threat to its iconic toy-block franchise. 'Look, I can't beat them on the money front,' he said. 'I can only beat them on the moral front.' " *Id.* at 3, 5–6.

*The Hartford Courant's* January 29, 2012 account of Geller's interview with its reporter [Doc. 45-4] is in a similar vein, although it concentrates more upon the pleadings in the litigation Lego filed against Best–Lock in October 2011, and the opinions thereon of one Chris Byrne, described as "a longtime industry analyst who has been an expert witness in trademark and copyright cases," *id.* at 2. The article begins with similar evocations by Geller of his childhood; reporter Lee writes: "Torsten Geller loved LEGO blocks as a kid growing up in Germany. As a young father in England 15 years ago, he was indignant when he saw Mega Blocks and other construction toys that mimicked the designs of the iconic Danish brand.... Then he found out LEGO itself had copied the bricks invented by a British psychologist in the 1940s or at least patterned its line after them." *Id.* The *Courant* article continues: "Geller, who runs Hong Kong-based Best–Lock from the west coast of Canada, said he decided to become a LEGO competitor in part because he thought it was unethical that the Danish firm copied the British bricks invented by Hilary Page. In an interview Friday, he acknowledged the similarities between the shapes of Best–Lock's figures and LEGO's. 'I did the figures because I want to piss them off,' he said. In any event, Geller added, 'The copyright of figures is completely loony.' " *Id.* at 4. The article also quotes Geller's contention that the conduct of Lego "was unscrupulous and immoral," not that of Best–Lock, as Lego charged in its pleadings. *Id.*

On February 13, 2012, less than a month after these accounts of Geller's interviews were published, Lego filed its First Amended Complaint [Doc. 40] ("FAC"). For the first time in this action, Lego names Best–Lock Hong Kong and Geller personally as defendants: hence the present Rule 21 motion to join them as additional parties. The propriety of adding Geller as an individual party defendant requires analysis of the FAC's allegations of fault and liability against him.

## C. *The First Amended Complaint's Allegations against Torsten Geller*

In its FAC, Lego alleges at ¶ 20 that "on or about January 27, 2012, Geller gave one or more interviews to one or more reporters regarding the LEGO Group's pending lawsuit against Best–Lock." The *Hartford Business Journal* and *Hartford Courant* interview articles are specifically alleged, and characterized as including "defamatory and derogatory remarks and false information from Geller about the LEGO Group." FAC, ¶ 21.

Count II of the FAC asserts claims for defamation against Best–Lock [1] and Geller. The FAC alleges upon information and belief at ¶ 37 that "Geller is the founder and CEO of Best–Lock, and at the time he made the defamatory statements described above, was the CEO, an officer, employee, and/or agent acting for and on behalf of Best–Lock and *was also acting on behalf of himself as an individual.*" (emphasis added). ¶ 40 alleges: "The defamatory statements made by Geller were willful and intended to seriously harm plaintiffs' reputation, goodwill, and business prospects, and impugned the basic integrity, honesty, and trustworthiness of the plaintiffs." ¶ 41 alleges: "Further, Geller's de-

famatory statements against the LEGO Group involve charges of moral turpitude, improper conduct, or lack of skill and integrity in its business, are calculated to cause injury to the business of the LEGO Group, and constitute defamation per se."

On the question of liability among the defendants for this defamation, the FAC alleges as follows:

42. Accordingly, the LEGO Group is entitled to recover general damages from Geller for the defamatory statements made by Geller.

43. The LEGO Group is also entitled to recover general damages from Best–Lock for the defamatory statements made by Geller to the extent the statements were made in his capacity as CEO, an officer, employee, and/or agent acting for and on behalf of Best–Lock.

The present motion requires the Court to decide whether it should grant leave to Lego to add Geller to this action as an individual party defendant, for the purpose of asserting these claims against him.

## II. DISCUSSION

## A. *Preliminary Analysis of Issues Presented by Lego's Motion to Add Torsten Geller as a Defendant*

The threshold question presented by Lego's motion to add Geller as a defendant is whether he is subject to the personal jurisdiction of this Court. If the Court lacks personal jurisdiction over Geller, then Lego's accusations of defamation by Geller, while full of sound and fury, can signify nothing in the litigation, and would not justify the empty gesture of adding him as a defendant.

---

1. The FAC alleges claims against both Best–Lock Construction Toys, Inc. (the original defendant in the case) and Best–Lock Limited Hong Kong (an additional defendant). Throughout the pleading, these two corporate defendants are referred to collectively as "Best–Lock."

Best–Lock places this question of personal jurisdiction at issue by arguing in its brief [Doc. 63] at 1 that "Mr. Geller is a private citizen and resident of British Columbia, Canada with no personal contacts with the state of Connecticut whatsoever. Any statements made by Mr. Geller were in his capacity as a corporate representative of the Best–Lock corporate defendants."

Lego contends that the Connecticut long-arm statute gives the Court personal jurisdiction over Geller as the result of his transaction of business within the state, either individually or, if that theory be rejected, by piercing "the corporate veil of Best–Lock to gain jurisdiction over Geller since this Court unquestionably has jurisdiction over Best–Lock." Main brief [Doc. 45] at 10.

Best–Lock responds that the claims alleged in the FAC do not fall within the long-arm statute, and there is no basis for piercing Best–Lock's corporate veil in order to impose personal liability upon Geller.

These substantive disputes are fought within the procedural arena fashioned by the Federal Rules of Civil Procedure, a subject which the Court now considers.

### B. *Procedural Rules Governing Lego's Motion*

■ By this motion, Lego seeks to (a) file an amended complaint which (b) adds Geller as an additional party defendant. Since an objection is made, Lego requires an order of the Court to allow the filing of the proposed amended pleading. If Lego's only purpose was to amend its complaint to assert an additional claim of defamation, the motion would fall under Federal Rule of Civil Procedure 15(a)(2), which provides that at this stage of the litigation "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Notwithstanding the seeming liberality of the Rule's last-quoted sentence, the Second Circuit cautioned in *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir.2009), that "motions to amend *should generally be denied* in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." (citing the Supreme Court's seminal opinion in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)) (emphasis added).

In the case at bar, Lego seeks not only to amend its complaint, but also to add a new defendant. That implicates Rule 21, which provides in pertinent part: "On motion or on its own, the court may at any time, on just terms, add or drop a party." With respect to the interaction of these procedural Rules, it has been held that "Rule 15(a) generally governs the amendment of complaints, but in the case of proposed amendments where new defendants are to be added, Rule 21 governs." *United States v. Hansel*, 999 F.Supp. 694, 697 (N.D.N.Y.1998) (citations omitted). However, the perceived supremacy of Rule 21 is of no practical consequence, since it is generally held that the standards governing motions to amend under Rule 15 apply with equal force to motions to add parties under Rule 21. *See, e.g., Hansel*, 999 F.Supp. at 697–98; *Oneida Indian Nation of N.Y. State v. County of Oneida*, 199 F.R.D. 61, 72 (N.D.N.Y.2000) ("[B]ecause in practical terms there is little difference between [Rules 15(a), 20(a) and 21] in that they all leave the decision whether to permit or deny amendment to the district court's discretion, the court will not separately analyze the present motions under each of those three Rules.") (citation and internal quotation marks omitted); *Mytee Prods., Inc. v. H.D. Prods., Inc.*, No. 05–

CV–2286W, 2007 WL 4105713 (S.D.Cal. Nov. 16, 2007), at *3–*4 (applying *Foman* standards to a motion to amend complaint so as to add a party plaintiff).

This Court will apply the standards governing amendment of pleadings, as articulated by *Foman* and its progeny, to Lego's motion to add Geller to the case as a defendant. However, it should be kept in mind that all such considerations are subject to the overarching question of whether Lego has established personal jurisdiction over Geller at all.

### C. *The Connecticut Long–Arm Statute*

■ Lego, as the proponent of jurisdiction, has the burden of establishing that this Court has personal jurisdiction over Torsten Geller. *Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir.1990). No discovery has been conducted to date on this issue. In consequence, at this initial stage Lego need only allege facts constituting a prima facie showing of personal jurisdiction. *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir.1997). At this stage, the Court construes pleadings and affidavits in Lego's favor. *Id.*

Lego's first theory is that Geller's defamatory statements to the two Hartford newspapers constituted the transaction of business by Geller in Connecticut, thereby subjecting Geller to personal jurisdiction in the state by virtue of Connecticut General Statutes § 52–59b(a), in the vernacular the "long-arm statute." § 52–59b provides in pertinent part:

(a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual . . . who in or through an agent:

(1) Transacts any business in the state;

(2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act;

(3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; . . . .

The only count in the three-count FAC which charges Geller personally with wrongful conduct and seeks damages from him personally is Count II, captioned "Defamation against Best–Lock and Geller." [2] Consequently, it is not surprising that Lego's briefs purport to base long-arm jurisdiction over Geller solely upon sub-section 52–59b(a)(1); sub-sections (a)(2) and (a)(3) specifically exclude from the statute's reach "a cause of action for defamation of character." Geller's defamatory statements constitute the only conduct the FAC alleges against him specifically. Accordingly, Lego's long-arm theory has to be that Geller's defamatory statements, while excluded *qua* statements by sub-sections (a)(2) and (3) as bases for personal jurisdiction, nonetheless constituted the transaction of business by Geller in Connecticut, thereby supporting jurisdiction under sub-section (a)(1).

That theory is questionable under Connecticut law. In *Doe v. Ciolli*, 611

---

**2.** Count I is captioned "Copyright Infringement against Best–Lock" and its allegations are limited to those corporate defendants. Count III, while captioned "Violation of the Connecticut Unfair Trade Practices Act against Best–Lock and Geller," limits its allegations of wrongful conduct to Best–Lock.

F.Supp.2d 216 (D.Conn.2009), District Judge Droney (as he then was) considered the case of a Texas citizen who posted on a law school admissions website statements about female Connecticut citizens attending Yale Law School. The students found the statements offensive, and sued the Texas citizen in this Court, asserting seven causes of action: "(1) Copyright Infringement; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's life; (4) publicity that places another in a false light before the public; (5) intentional infliction of emotional distress; (6) negligent infliction of emotional distress; and (7) libel." 611 F.Supp.2d at 218. The Texas defendant challenged the court's personal jurisdiction over him. Judge Droney held that "[defendant] Ryan's postings on AutoAdmit, which were specifically targeted at the plaintiffs in Connecticut, are sufficient to exercise jurisdiction under § 52–59b(a)(2)," *id.* at 222, but raised *sua sponte* the question whether the long-arm statute could confer personal jurisdiction with respect to the seventh count, for libel. Judge Droney said at 223 n. 5:

> Although the parties have not briefed this particular issue, § 52–59b(a)(2) has a specific exemption for "causes of action for defamation." It is arguable that the long-arm statute may not permit the Court's exercise of personal jurisdiction over the plaintiff's claim for libel in Count Seven. "Defamation" includes the torts of libel (usually written) and slander (usually oral). However, as the language of section 52–59(a) indicates, a plaintiff must establish an independent basis for personal jurisdiction for each separate cause of action. By its language, Section 52–59b(a)(2) does not provide jurisdiction for defamation claims. However, as this issue has not yet been addressed by the parties, the Court will not dismiss this Count as this time.

(citations and internal quotation marks omitted).

These reflections do not squarely impact upon the case at bar. Judge Droney was questioning the effect of the § 52–59b(a)(2) exemption for defamation upon that subsection's grant of long-arm jurisdiction for tortious acts committed within the state, whereas Lego views Geller as transacting business within the state and consequently subject to long-arm jurisdiction under subsection (a)(1).

The Second Circuit came closer to the mark in *Best Van Lines, Inc. v. Walker,* 490 F.3d 239 (2d Cir.2007). Defendant Walker, a resident of Iowa, was the proprietor of a not-for-profit internet website providing information and opinions about professional household movers. On several occasions, Walker posted on the website derogatory statements about plaintiff Best Van Lines, Inc., a New York-based moving company. Invoking the New York long-arm statute, Best Van sued Walker for defamation in the Southern District of New York. District Judge Lynch (as he then was) granted Walker's motion to dismiss the action pursuant to Rule 12(b)(2), on the ground that the statute did not give the district court personal jurisdiction over Walker.

The Second Circuit affirmed. Its extensive opinion, construing the New York long-arm statute as interpreted by New York courts, is instructive in the case at bar because the Connecticut legislature modeled this state's statute upon New York's. In *Zartolas v. Nisenfeld,* 184 Conn. 471, 440 A.2d 179 (1981), the Supreme Court of Connecticut, considering the meaning of the Connecticut long-arm statute's phrase "transacts any business," said: "The General Statutes do not define what the phrase 'transacts any business' means in the context of § 52–59b. We note, however, that in enacting § 52–59b,

the legislature used New York Civil Practice Law § 302 as a model. We therefore find pertinent the judicial interpretation given to that New York statute." *Id.* at 473–474, 440 A.2d 179 (citations omitted). This Court may therefore regard the Second Circuit's *Best Van* analysis of New York long-arm law as pertinent to the Connecticut statute's application in the case at bar.

This brings us to *Best Van's* discussion of the relationship, for long-arm jurisdictional purposes, between the broadly stated sub-section (1) basis "transacts any business within the state" and the specific exclusions in sub-sections (2) and (3) for "a cause of action for defamation." On that point, it is useful to quote the Second Circuit's opinion at some length:

It may be that the meaning of "transact[ing] business" for the purposes of section 302(a)(1) overlaps significantly with the constitutional "minimum contacts" doctrine.... But we do not understand New York courts to teach that the "gap" created by the defamation exceptions in sections 302(a)(2) and (3) is eliminated by the "transact[ing] business" analysis. Some distance remains between the jurisdiction permitted by the Due Process Clause and that granted by New York's long-arm statute.

New York courts do not interpret "transact[ing] business" to include mere defamatory utterances sent into the state. Although section 302(a)(1) does not exclude defamation from its coverage, New York courts construe "transacts any business within the state" more narrowly in defamation cases than they do in the context of other sorts of litigation. In other cases, "proof of one transaction," or a "single act," in New York is sufficient to invoke long-arm jurisdiction, even though the defendant never enters New York.... In defamation cases, by contrast, the "single act" of uttering a defamation, no matter how loudly, is not a "transact[ion of] business" that may provide the foundation for personal jurisdiction. In other words, when the defamatory publication itself constitutes the alleged "transact[ion of] business" for the purposes of section 302(a)(1), more than the distribution of a libelous statement must be made within the state to establish long-arm jurisdiction over the person distributing it.

490 F.3d at 247–48 (citations and some internal quotation marks omitted). The Second Circuit, affirming the district court, held that the circumstances of the case did not allow a finding that defendant Walker, the Iowa citizen and self-appointed critic of the moving industry, was transacting business in New York sufficient to sustain personal jurisdiction under the long-arm statute.

This Court reached the same conclusion in the somewhat similar case of *Nedgam Productions, LLC v. Bizparentz Foundation,* No. 3:09–CV–500, 2010 WL 3257909 (D.Conn. Apr. 29, 2010), another opinion by Judge Droney. Both parties at bar cite *Nedgam* in their briefs: Best–Lock says the case furnishes direct, on-all-fours authority for dismissing Lego's purported action against Geller, and Lego says the case is entirely distinguishable. In *Nedgam,* the individual defendant at issue, Anne Henry, sent an e-mail to a *Hartford Courant* reporter stating, *inter alia,* that the plaintiffs in that action were under investigation by the FBI. The reporter included a number of Henry's statements in an article in the *Courant* and posted the full e-mail online. According to Henry's affidavit, she neither asked the reporter to refer to her e-mail nor authorized him to publish its contents. She sent the e-mail to the reporter's personal e-mail account and did not post it on the publicly viewable section of the reporter's blog. Henry's e-mail did not state that the information was given

"off the record," and she did not ask the reporter not to make her statements public. *Id.* at \*5. There was also a corporate defendant in *Nedgam:* Bizparentz Foundation, a non-profit California corporation run from Henry's house in California. Bizparentz acted as a self-appointed watchdog whose "mission appears to be the prevention of exploitation of child actors by the entertainment industry"; Henry sent an e-mail to a *Hartford Courant* reporter stating that the plaintiff corporation "might be an organization engaged in scams involving child actors." 2010 WL 3257909, at \*1.

In a thorough opinion, Judge Droney concluded that the e-mail in question did not establish personal jurisdiction over Henry in Connecticut. "Henry did not have the active and personal involvement with the publication or dissemination of her e-mail that is required to have this single communication meet the test of 'transacting business' in Connecticut." *Nedgam* at \*5. "Particularly when factoring in the explicit exemption for defamation claims under [other provisions of] § 52–59b, it cannot be said that Henry's single act of sending one allegedly defamatory e-mail into Connecticut is sufficient for the purpose of establishing personal jurisdiction over Henry under the long-arm statute." *Id.*

*Best Van* and *Nedgam* tend to favor Geller in the case at bar, insofar as they hold that a nonresident defendant's defamatory statements made outside the state and published within it cannot establish personal jurisdiction under the long-arm statute, whether termed the transaction of business or not.[3] These cases may be read to answer, in a fashion favorable to Geller,

the question Judge Droney posed *sua sponte* in *Doe v. Ciolli.*

Other Connecticut cases are consistent with a refusal to find personal jurisdiction in this one. In *Jones v. Trump,* 919 F.Supp. 583 (D.Conn.1996), a Connecticut-resident former press agent for Mrs. Maria Trump sued a number of nonresident Trump-affiliated defendants for, *inter alia,* defamation. Judge Dorsey dismissed the defamation claims for lack of personal jurisdiction, rejecting plaintiffs claim that jurisdiction lay under the long-arm statute:

> Nor does any claim arise from a defendant's transaction of business within the state, as enumerated in subsection (a)(1). Plaintiff alleges that defendants made defamatory statements to out-of-state news media, such as the *New York Post,* which were disseminated in Connecticut. Such acts, however, have typically been found not to constitute business transactions encompassed by § 52–59b(a).

*Id.* at 586 (citations omitted).

In *Kirwin v. Adkins,* No. CV 990173500, 2000 WL 278706 (Conn.Super.Ct. Feb. 29, 2000), the plaintiff resident in Connecticut and a nonresident defendant had operated a bus tour business. The plaintiff sued the defendant for falsely disparaging her to people in the state, in connection with the defendant setting up her own competing business. The Connecticut Superior Court held that the long-arm statute did not establish personal jurisdiction over the nonresident defendant, reasoning:

> The plaintiff alleges that the defendant made her defamatory remarks to deprive the plaintiff of business and to promote the defendant's own business.

---

**3.** Geller is not a resident of Connecticut. While his interviews disparaging Lego were given to Connecticut journals and published in the state by them, Lego does not allege, and there is no indication in the published articles or elsewhere in the FAC, that Geller was in Connecticut when he was interviewed. Journalists have been known to conduct interviews by telephone.

The plaintiff is attempting to avail herself of General Statutes § 52–59b(a) involving jurisdiction over a nonresident individual who "transacts any business in the state." The complaint, however, clearly is based on slander or defamation, not on something arising out of transacting business. It is a tort action the gravamen of which is defamation. The plaintiff did not allege a cause of action arising from the defendant's transaction of business in this state, such as a claim for breach of contract or breach of an implied covenant.

Thus, the plaintiff has not sustained her burden of proving that the defendant in this present action is amenable to in personam jurisdiction under General Statutes § 52–59b(a)(1) or (2), and the defendant's motion to dismiss is therefore granted.

*Id.* at *1–*2.

In light of the cases cited *supra,* Lego has not sustained its burden of persuasion that Torsten Geller is amenable to in personam jurisdiction in this Court under the Connecticut long-arm statute with respect to the conduct charged against him by Lego in its First Amended Complaint. I use the phrase "burden of persuasion" rather than "burden of proof," because there has been no discovery and Lego need only make a prima face showing of personal jurisdiction over Geller, but Lego does not sustain its jurisdictional burden, however phrased.

It bears repeating that the only personal conduct on the part of Geller of which Lego complains is his defamatory statements during the two Hartford interviews, apparently given on the same day. The FAC's caption names the Best–Lock corporations and Geller as defendants, but only Best–Lock is charged in Count I for copyright infringement. Count III, the CUTPA claim, refers to Best–Lock and Geller in its sub-caption, but the specific conduct alleged is exclusively that of Best–Lock. Count II, the only one describing conduct by Geller, alleges "a tort action the gravamen of which is defamation," to quote the Connecticut court in *Kirwin v. Adkins. Kirwin* held that such an action did not survive the long-arm statute's explicit exclusion of defamation actions, notwithstanding the fact that the plaintiff and defendant were business competitors and plaintiff alleged defendant defamed her for business purposes.

■ *Best Van* and *Nedgam* may be partially distinguished on the ground that the parties in those cases were not business competitors; both defendants were self-appointed industry watchdogs and critics, not participants in the industries in question, or competitors of the targets of their disapproval. The case at bar differs in that respect, since in the specialized world of children's construction toys Lego and Best–Lock compete strenuously, and Geller, Best–Lock's chief executive, would not be indifferent to the fray. Nonetheless, the weight of Second Circuit and Connecticut authority is clearly against extending long-arm jurisdiction to defamatory statements made by nonresidents, even if made within the state, and by one business competitor against another. The courts do not favor subjecting an individual nonresident utterer of defamation, however hurtful or unfair, to long-arm jurisdiction by allowing the statute's broad and undefined concept of "transacting business" to trump its explicit and unambiguous exclusions of long-arm jurisdiction for "a cause of action for defamation of character." This Court agrees with that weight of authority.

Perhaps anticipating that adverse conclusion, Lego advances an additional basis for the Court's personal jurisdiction over Geller. This is the corporate veil-piercing concept, and I discuss it separately, in Part II.D.

## D. *Corporate Veil–Piercing*

In its Main Brief [Doc. 45] at 10–12, Lego makes these arguments:

Even if this Court finds that it does not have personal jurisdiction over Geller based on his transaction of business as a corporate representative, the Court can still pierce the corporate veil of Best–Lock to gain jurisdiction over Geller since this Court unquestionably has jurisdiction over Best–Lock. . . . Since Best–Lock is merely the alter ego of Geller, this Court has personal jurisdiction over Geller individually. . . . The facts available indicate that Best–Lock is a shell company dominated by Geller to advance his own, admitted "vendetta" against the LEGO Group. Geller is, therefore, merely an alter ego of Best–Lock. Due to the fact that this Court already has personal jurisdiction over Geller's alter ego Best Lock, it also has jurisdiction over Geller.

The careful reader will have noted a certain ambiguity in this discussion. At page 11 of Lego's brief, it is said: "Best–Lock is merely the alter ego of Geller." At page 12, it is said: "Geller is, therefore, merely an alter ego of Best–Lock." The next sentence (reverting to the original casting) says that the Court has jurisdiction over "Geller's alter ego Best Lock." According to Lego's stage directions, which actor in the drama has the subservient role of "merely" an alter ego—who plays Horatio to Hamlet? Within two pages of its brief, Lego casts Geller in both parts.

One need not pursue that question further because it is apparent that in either event, Lego's FAC does not allege facts sufficient to justify corporate veil-piercing as a vehicle for imposing personal liability (and thus personal jurisdiction) upon Geller.

It is perfectly apparent that Torsten Geller thinks ill of Lego, and wishes to compete successfully against it in the global marketplace for specialized toys. Geller does not challenge the accuracy of the denigrations of Lego attributed to him in the Hartford *Courant* and *Business Journal* interviews. Those statements are defamatory in the common-law sense; Best–Lock does not contend otherwise (without conceding that the statements are false). Geller reveals himself during those interviews as a determined rival of Lego, motivated by senses of childhood betrayal and parental ire which seem to combine in a sort of Freudian or Jungian rage—"vendetta" is the word which, according to his interviewers, Geller chose himself to describe his commercial objective *vis-a-vis* Lego.

To pursue that competitive objective, Geller was instrumental in forming two corporations: Best–Lock Construction Toys, Inc., a Florida corporation with its principal place of business in Miami; and Best–Lock Limited, Hong Kong, a Hong Kong corporation with its principal place of business within that territory. The FAC alleges at ¶ 4, and Defendants' submissions do not deny, that Best–Lock Hong Kong "supplies Best–Lock [Construction Toys] toy blocks and figures for importation into and sales throughout the United States, including the State of Connecticut." In other words, Geller chose to enter the toy business and compete with Lego by forming corporations for those purposes.

██ Corporations are venerable creatures of the law. They exist in order to facilitate limited investment in commercial enterprises while shielding an entrepreneur's personal wealth from the risk of paying for corporate indebtedness. "The original purpose of incorporation laws was to enable stockholders to invest a reasonable amount of capital in an enterprise while insulating their uninvested assets

from liability." *Talaria Waste Mgmt., Inc. v. Laidlaw Waste Sys., Inc.,* 827 F.Supp. 843, 847 (D.Mass.1993) (construing Massachusetts law). "Indeed, New York allows individuals to incorporate for the very purpose of avoiding personal liability." *William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 600 (2d Cir.1989) (New York law; citations and internal quotation marks omitted). The "corporate veil" to which case law refers is that veil drawn between corporate debt and uninvested individual assets, shielding the latter from the former. "[T]his shareholder shield encourages business investments in high-risk areas by enabling investors who utilize the corporate form to make capital contributions to corporations while insulating their personal wealth from the risks inherent in business. . . . Because of the beneficial role of the corporate concept, the limited liability attendant to corporate ownership should be disregarded only in exceptional circumstances." *Riggins v. Dixie Shoring Co.,* 590 So.2d 1164, 1167–68 (La.1991) (Louisiana law); "Corporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits incorporation of businesses for the very purpose of isolating liabilities among separate entities." *Yoder v. Honeywell Inc.,* 104 F.3d 1215, 1220 (10th Cir.1997) (Colorado law) (citation and internal quotation marks omitted). These cases construe the law of several jurisdictions, but the principles they articulate are of general application.

■ Connecticut law is to the same effect. Connecticut recognizes that its long-arm statute may extend personal jurisdiction based on a corporate alter ego theory. "[B]efore [a long arm] statute can be utilized as a basis for the exercise of jurisdiction over the [nonresident] foreign corporation, the corporate veil must be pierced

so that acts of the domestic subsidiary can be imputed to the absent parent." *Hersey v. Lonrho, Inc.,* 73 Conn.App. 78, 86, 807 A.2d 1009 (2002) (citation and internal quotation marks omitted). This reasoning applies to the assertion that Best–Lock is Geller's alter ego.[4]

■ In doing business through the Best–Lock companies, Geller invokes and relies upon this established concept of corporate ownership, thereby veiling himself from personal liability. Lego seeks to pierce that veil and hold Geller personally liable for defaming Lego. That remedy is conceptually available to Lego, but it is not favored by the law and must be sought in a particular manner. Under federal or Connecticut law, Lego must provide a specific averment of facts, which, if credited, would establish that Best–Lock is Geller's alter ego. *S. New England Tel. Co. v. Global NAPs Inc.,* 624 F.3d 123, 138–39 (2d Cir. 2010) (applying both federal and Connecticut law). Where no evidentiary hearing has been held, the plaintiff must make a prima facie showing, based on its own pleadings, affidavits and supporting materials, which justifies disregard of the corporate form. *Southern New England Telephone* at 138.

■ The standards for establishing alter ego status under federal and Connecticut law produce the same result in the present case. The Court therefore need not decide which jurisdiction's law governs the analysis here. *Southern New England Telephone* at 139 (declining to decide whether federal or Connecticut law applies to this issue). Under federal law, courts disregard corporate formalities when a corporation's owner exercises "total and exclusive domination of the corporation." *Id.* at 139, *quoting Lowen v. Tower Asset*

---

4. Notwithstanding the previously noted ambiguities in Lego's brief, this would seem to be the casting of characters Lego posits: Best–
 Lock playing an alter ego Horatio to Geller's Hamlet.

*Mgmt., Inc.,* 829 F.2d 1209, 1221 (2d Cir. 1987). Under Connecticut law, the veil may be pierced where "a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock...." *Naples v. Keystone Bldg. & Dev. Corp.,* 295 Conn. 214, 231–32, 990 A.2d 326 (2010). "Ordinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Id.* at 233, 990 A.2d 326.

 Lego does not allege facts that, taken as true, would show that Best–Lock is Geller's alter ego. The Amended Complaint contains no allegations about the ownership of Best–Lock's stock or Geller's domination of the company. Its only allegation about Geller's relationship to Best–Lock is that "Geller is the founder and CEO of Best–Lock and, at the time he made the defamatory statements described above, was the CEO, an officer, employee, and/or agent acting for and on behalf of Best–Lock and was also acting on behalf of himself as an individual." Comp. ¶ 37. That, if true, would not establish alter ego status. Indeed, the complaint does not contain even conclusory allegations on this subject. Lego relies instead on assertions made in its briefs. Memorandum of Law in Support of Plaintiffs' Motion to Join Additional Parties ("Supp. Memo.") [Doc. 45] at 10–12; Reply Brief in Further Support of Plaintiffs' Motion to Join Additional Parties ("Reply Memo.") [Doc. 71] at 5–6.

In its initial brief, Lego presents two reasons for finding alter ego status. First, it argues that "Geller sits at the controls of Best–Lock and directs it based on his own desire to damage the LEGO Group." Supp. Memo. at 11. This assertion is based on statements attributed to Geller in the two articles, such as "I did the figures

because I want to piss them off," Ex. 4 at 2, and "That's why I started this business. It's a personal vendetta, yes," Ex. 3 at 4. These statements are entirely insufficient to show that Geller either owns all or most of Best–Lock's stock, or has exclusive domination over it.

Second, Plaintiff describes an incident in which Best–Lock's counsel asserted that Geller was the only person who could locate certain documents requested in discovery. Supp. Memo. at 12. This incident, however irksome to Lego, does not bear on the alter ego status of Best–Lock. By Lego's reasoning, if Best–Lock told Lego that an administrative assistant at Best–Lock was the only person who could locate certain documents, Best–Lock would be the alter ego of the administrative assistant.

In its reply brief, Lego adds an additional argument. It asserts that Geller, in a declaration in support of Best–Lock's Motion for a Preliminary Injunction, "treats himself as the company, substituting 'Best–Lock' with 'I.'" Reply Memo. at 5. For example, in Paragraph 9 of his second declaration, Geller, apparently speaking on behalf of Best–Lock, asserts that "I do not recall ever seeing a copyright notice on Lego's minifigures." Reply Declaration of Torsten Geller, attached as Exhibit 1 to Defendant and Counterclaim Plaintiffs'[sic] Reply Memorandum in Support of Their Motion for Preliminary Injunction [Doc. 52], ¶ 9. This wording may suggest that Geller identifies himself with the corporation, but it does not establish that Geller is Best–Lock's sole or primary shareholder, or that Geller has exclusive domination over it. Neither federal nor Connecticut law bases alter ego status on emotional identification.

As noted *supra,* in order to establish that Best–Lock is Geller's alter ego for the purposes of the present Motion, Lego

must provide "a specific averment of facts." *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 131 (2d Cir. 2010). But Lego has not averred any facts which, taken as true, would establish alter ego status. Instead, the weakness of the arguments in Lego's briefs suggests that Lego has no reason to assert that Best–Lock is Geller's alter ego, apart from a desire to entangle Geller personally in the case, imperil his uninvested assets, and subject him to personal expense: a form, one might say, of litigious vendetta.

In *Network Enterprises, Inc. v. APBA Offshore Productions and Michael D. Allweiss*, 264 Fed.Appx. 36 (2d Cir.2008), the Second Circuit illustrated the application of these principles. The plaintiff, a cable television network, sued a Florida corporate purchaser of network time (Offshore) and its principal (Allweiss), claiming breach of contract and seeking to hold the principal personally liable. After a bench trial in the Southern District of New York, the district court entered judgments that Offshore breached its contract with the plaintiff, and (piercing the corporate veil) that Allweiss was personally liable for plaintiff's damages. On appeal by both defendants, the Second Circuit affirmed those judgments. With respect to the district court's corporate veil piercing, the court of appeals said:

> To pierce the veil in New York, a plaintiff must show (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil. To pierce the corporate veil under Florida law, a plaintiff must show that the corporation is a mere instrumentality or *alter ego* of the defendant and that the defendant engaged in improper conduct. As we conclude that veil piercing is warranted in this case under either standard, we do not reach

the questions of whether a conflict of law exists and if so, which law should apply.

264 Fed.Appx. at 40 (citations and internal quotation marks omitted). The Second Circuit held that veil piercing was warranted *in Network Enterprises* on the basis of the facts plaintiff alleged in its pleadings and proved at the trial:

> There appears to be no serious dispute that Allweiss dominated Productions, as he (1) formed the company; (2) at all times served as its sole owner and member; (3) conducted all of its business, including maintaining the corporate bank account, signing the TBA, exercising the renewal option, and causing the company to cease negotiations under the ROR; and (4) operated the company from the same address where he maintained his law practice. Furthermore, Allweiss removed money from Productions' account and left the company insolvent before he caused it to sign the TBA and exercise the renewal option under the ROR. Insolvency at the time of a transaction and siphoning off funds by the dominant shareholder are relevant to veil piercing consideration. By the time of the transactions at issue here, Productions had the markings of a shell corporation dominated by Allweiss.

*Id.* (citations and internal quotation marks omitted; "TBA" and "ROR" are designations the parties used for the contract in suit).

*Network Enterprises* is relevant to the case at bar not as a binding precedent, but as an illustration of the considerations in which the Second Circuit engages in deciding whether to pierce corporate veils, and as a stark contrast with the facts alleged (and not alleged) by Lego in support of its *pro forma* argument that the Best–Lock corporations' veils should be pierced in order to impose personal liability upon

Geller. The courts in *Network Enterprises* pierced the corporate veil because the individual defendant had diverted all the corporate assets and left the corporation penniless and unable to pay the plaintiffs proved damages. The case at bar is entirely different. Lego does not allege that the Best–Lock corporations are mere shells, dominated in all material ways by Geller's personal conduct. According to Geller's uncontradicted declarations [Docs. 37–2 and 52–1], the Best–Lock corporations were founded in 1997, their products were first sold to retailers in the United States in 1998, since that year about 15,-000,000 Best–Lock figures have been sold in the United States, and Best–Lock also does business in the United Kingdom and several European countries (to Lego's displeasure, expressed in litigation). What emerges is a picture of vibrant corporations, making their products, marketing them globally, operating through ranks of employees, paying their bills, counting their gains (if any), able to satisfy a judgment against them for defamation, should one be obtained: in short, real corporations, not muted dummies or empty shells dominated by a single individual.

The Court is not in a position to find as a fact that this picture of corporate vitality and health is accurate, nor does it do so in this ruling. But Lego's allegations and conjectures are entirely insufficient to plead a prima facie justification for piercing the corporate veil in this case. In consequence, veil-piercing plays no part in the Court's evaluation of the propriety of Lego's amending its complaint to add a claim for defamation against Geller personally. For the reasons stated in Part II.C, that amendment will not be allowed because the Court does not have personal jurisdiction over Geller.

### E. *Additional Considerations*

 The propriety of allowing Lego to amend its complaint to allow an *in person-am* claim against Geller for defamation is called into further question by its redundance as a practical matter. Accepting without deciding that Geller's statements to the Hartford journals constituted the common law tort of defamation, Geller uttered those statements while a Best–Lock officer, and their plain intent was to disparage Lego to Best–Lock's competitive advantage. Best–Lock would accordingly be liable to Lego for proven damages caused by the defamation.

The FAC recognizes as much. Best–Lock and Geller are both named as defendants in Count II, which asserts the defamation claim. ¶ 43 alleges that Lego is "entitled to recover general damages from Best–Lock for the defamatory statements made by Geller to the extent the statements were made in his capacity as CEO, an officer, employee, and/or agent acting for and on behalf of Best–Lock." Lego's theory of the case appears to be that when he made these statements, Geller was acting in two capacities: Best–Lock CEO and private individual. One cannot otherwise account for the allegation in ¶ 42 of the FAC that Lego "is entitled to recover general damages from Geller for the defamatory statements made by Geller." Lego does not explain in its submissions how a trial jury could be instructed to allocate Lego's defamation damages between those caused by Geller's speaking the same words at the same time as Best–Lock CEO on the one hand, and as a private individual on the other. One need not dwell on the question. Quite apart from the decisive lack of personal jurisdiction over Geller, such an exercise would be nonsensical: the sort of splitting a single cause of action that the law does not favor.

An amended complaint adding Geller as an individual defendant would not satisfy the requirements of propriety derived

from the Supreme Court's decision in *Foman* and its progeny.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that it does not have personal jurisdiction over Torsten Geller. That jurisdiction cannot be founded upon the Connecticut long-arm statute; and concepts of corporate veil-piercing have no legitimate function to perform in the jurisdictional analysis.

If, contrary to this conclusion, Geller were subject to the Court's *in personam* jurisdiction, the Court would not allow an amended complaint naming him as an additional defendant.

The Plaintiffs' motion to amend its complaint so as to add a claim for defamation and to join additional parties is GRANTED with respect to including a separate count for defamation, and with respect to joining Best–Lock Hong Kong as an additional party Defendant.

Plaintiffs' motion is DENIED with respect to joining Torsten Geller as an additional party Defendant.

Plaintiffs are directed to file and serve an Amended Complaint consistent with this Ruling on or before August 30, 2012, failing which the case will proceed on the basis of the original complaint, answer and counterclaims. If Plaintiffs file an Amended Complaint, the Defendants are directed to respond to it in accordance with the Federal Rules of Civil Procedure.

It is SO ORDERED.