Dan **FRIEDMAN**, Plaintiff,

v.

**BLOOMBERG LP**, Christopher Dolmetsch, Erik Larsen, Michael Hytha, Andrew Dunn, Milltown Partners, Patrick Harversen, D.J. Collins, Oliver Rickman, Palladyne International Asset Management BV, Ismael Abudher, and Lily Yeo, Defendants.

Civil No. 3:15-cv-443(AWT)

United States District Court, D. Connecticut.

Signed March 25, 2016

Alan H. Kaufman, Kaufman LLC, New York, NY, Stephen G. Grygiel, Silverman, Thompson, Slutkin & White, LLC, Baltimore, MD, for Plaintiff.

Edward J. Davis, Yonatan Berkovits, Davis Wright Tremaine LLP, Derek J.T. Adler, Ned H. Bassen, Hughes, Hubbard & Reed, New York, NY, Samuel M. Leaf, The Law Office of Samuel M. Leaf, Westport, CT, Alfred U. Pavlis, Finn Dixon & Herling, Stamford, CT, for Defendants.

## RULING ON MOTIONS TO DISMISS

Alvin W. Thompson, United States
District Judge

The plaintiff brings this action in response to statements published in a news article about an employment action brought by the plaintiff against his former employer and others. The complaint has two counts: defamation (Count I) and punitive damages (Count II).

Defendants Milltown Partners LLP ("Milltown"), Patrick Harverson,[1] David-John Collins, and Oliver Rickman (collectively the "Milltown Defendants") and Palladyne International Asset Management BV ("Palladyne"), Ismael Abudher and Lily Yeo (collectively the "Palladyne Defendants") move to dismiss the complaint in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. Defendants Bloomberg L.P. ("Bloomberg"), Christopher Dolmetsch, Erik Larsen, Michael Hytha, and Andrew Dunn (collectively the "Bloomberg Defendants") move to dismiss the complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The motions to dismiss are being granted.

## I. FACTUAL ALLEGATIONS

"The complaint, which [the court] must accept as true for purposes of testing its sufficiency, alleges the following circumstances." Monsky v. Moraghan, 127 F.3d 243, 244 (2d Cir.1997).

The plaintiff, Dan Friedman ("Friedman"), is a former employee of Palladyne, which is based in Amsterdam, the Netherlands. He was fired by Palladyne in February of 2012 after working there since November 2011. On March 25, 2014, Friedman sued Palladyne, Abudher, Yeo and others alleging fraudulent inducement. Friedman alleged that "Palladyne was in fact no more than a front for $700 million of Libyan patrimony funneled to Palladyne by the late Shukri Ghanem, defendant Abudher's father-in-law and the former Prime Minister of Libya under the deposed Ghaddafi regime" and that through a "studied, systematic and fraudulent series of misrepresentations by Palladyne and its agent ... [Palladyne] lure[d] Friedman to a company that was little more than a fancy parking lot for defalcated money." (Complaint (Doc. No. 1) ("Complaint") at 2.)

On March 27, 2014, Bloomberg published an article about Friedman's fraudulent inducement lawsuit. This case arises from publication of that article.

Friedman alleges the following:

The Article claimed that Palladyne was "... sued in the US for as much as $500 million."

The Article printed a statement from an unnamed Palladyne source who claimed that Mr. Friedman "repeatedly tried to extort money" from Palladyne.

The Article printed a statement from an unnamed source that Friedman was "... dismissed for gross misconduct"

(Complaint ¶¶ 20–22.)[2] He argues that by publishing these statements, Bloomberg violated the "standards of ethics and pro-

---

**1.** The caption's spelling of defendant Harverson's last name as Harversen is incorrect.

**2.** In the Plaintiff's Opposition to Motions to Dismiss, the plaintiff concedes that "the allegation of 'gross misconduct' should be exclud-

ed from the defamation analysis[.]" (Plaintiff's Opposition to Motion to Dismiss (Doc No. 67) ("Plaintiff's Opposition") at 12 n. 15.) Accordingly the court does not evaluate this statement.

fessionalism taught in the leading journalism degree programs" as well as the Bloomberg Businessweek Code of Journalistic Ethics. (Complaint ¶¶ 23–24.) More specifically, he alleges that neither the article's primary reporters, defendants Dolmetsch and Larsen, nor the article's primary editors, defendants Hytha and Dunn, "made any effort to contact Friedman" to solicit his version of events. (Id. ¶ 25.) Friedman alleges that he contacted Bloomberg repeatedly, "[giving] Bloomberg the opportunity to rectify the errors that its reporters and editors had committed." (Id. ¶ 28.) The Complaint alleges that Bloomberg never made any correction.

Friedman alleges that the statement regarding as much as $500 million in damages was false because the claims in the complaint in the employment case were pled in the alternative and his "base claim" was only for $44,941,000. (Id. ¶¶ 30–31.) He alleges:

> The Reporter and Editor defendants were part of a legal reporting team and fully familiar with the Federal Rules of Civil Procedure and its provisions for alternative pleading. Further, as legal reporters and editors, they knew or should have known that alternative theories of recovery do not allow for cumulative damages and that Friedman's Inducement Case did not contain a claim for $500,000,000 in damages.

(Id. ¶ 90.)

Friedman also alleges that the representation that Friedman repeatedly attempted to "extort" money from Palladyne was "libel per se as it accused Friedman of having repeatedly engaged in felonious conduct." (Id. ¶ 74.)

Friedman alleges that "[i]nitially Bloomberg and the Reporter and Editor defendants published the defamation out of negligence and in direct contradiction of their professional ethics standards." (Id. ¶ 71.)

"[B]y failing to correct or retract the defamatory statements" after being contacted by Friedman, Bloomberg "acted with reckless disregard of the plaintiff's reputation and caused him serious and irreparable harm." (Id. ¶ 72.) Friedman alleges that the defendants made the allegedly defamatory statements when they knew that he was "unemployed and looking for work" and that the allegations by the defendants would negatively impact his "employment prospects in his chosen career." (See id. ¶¶ 75–78.)

With respect to Milltown, Friedman alleges that "at some point" after 2012, Palladyne hired Milltown to handle bad publicity about the company. Friedman alleges that after Bloomberg published the article, he "learned that defendant [Harverson] had made calls to other reporters, publishing the same information to them that [was] published in the Article" and that "other information had been emanating from an email address known as press@palladyne.com." (Id. ¶ 60.) He further alleges, "on information and belief," that "defendants Yeo and Abudher managed the information disseminated through press@palladyne.com and also were the primary contact persons for the Milltown defendants." (Id. ¶ 61.) Friedman alleges, "on information and belief," that the "Milltown and the Palladyne defendants were the sources of the defamatory information published by the Bloomberg defendants." (Id. ¶ 62.)

## II. LEGAL STANDARD

### A. Rule 12(b)(2)

On a Rule (12)(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. Metropolitan Life Insurance Co. v. Robertson–Ceco Corp., 84 F.3d 560,

566 (2d Cir.1996), cert. denied, 519 U.S. 1006, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). Where a defendant challenges "only the sufficiency of the plaintiff's factual allegation[s], in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction." Ball v. Metallurgie Hoboken–Overpelt, S.A., 902 F.2d 194, 196 (2d Cir.1990). "[W]hen a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials ... the allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." MacDermid, Inc. v. Deiter, 702 F.3d 725, 727 (2d Cir.2012) (quoting Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir.1993)).

**B. Rule 12(b)(6)**

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), (citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)(on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " Ashcroft v. Iqbal, 556

U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (citations omitted). However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." Id. at 570, 127 S.Ct. 1955. "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " Mytych v. May Dept. Store Co., 34 F.Supp.2d 130, 131 (D.Conn.1999) (quoting Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." United States v. Yale New Haven Hosp., 727 F.Supp. 784, 786 (D.Conn.1990) (citing Scheuer, 416 U.S. at 232, 94 S.Ct. 1683).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir.1993).

**III. DISCUSSION**

**A. Personal Jurisdiction over the Milltown and Palladyne Defendants**

The Milltown Defendants and the Palladyne Defendants move to dismiss the complaint in its entirety on the ground that this court does not have personal jurisdiction over them.

Defendant Milltown is a "partnership registered under the laws of the United Kingdom." (Complaint ¶ 8.) Its principal place of business is London, England. As set forth in affidavits accompanying the Milltown defendants' motion to dismiss, "Milltown has no real property, no employees, no offices, no bank accounts, and no assets in Connecticut." (Memorandum of Law in Support of the Milltown Defendants' Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2) and 12(b)(6) (Doc No. 25–1) ("Milltown Memorandum") at 3.) Likewise, "[i]t has no clients in Connecticut, derives no income from Connecticut and does not advertise in Connecticut." (Id.) Defendants Harverson, Collins, and Rickman are partners in Milltown. They work at Milltown's office in London and reside in England. Also, as set forth in affidavits accompanying the Milltown Defendants' motion to dismiss, none of them has ever resided in Connecticut, had a place of business in Connecticut, or owned any real property or assets in Connecticut. "None of them is alleged to have come to Connecticut or done anything in Connecticut in connection with the events that give rise to Plaintiff's claims." (Id.)

Defendant Palladyne "is a financial services firm organized as a besloten vennootschap ("BV") under the laws of [t]he Netherlands, where it has its principal and only place of business." (Memorandum of Law in Support of the Palladyne Defendants' Motion to Dismiss Under Fed. R. Civ. P 12(b)(2) and 12(b)(6) (Doc. No. 44) ("Palladyne Memorandum") at 3–4); (Complaint ¶ 12). As set forth in the complaint in the employment case, Palladyne's principal and only place of business is in the Netherlands. It is not licensed to do business in

Connecticut or anywhere else in the United States. "It has no real property, no employees, no offices, no bank accounts, and no assets in Connecticut." (Palladyne Memorandum at 4.) Defendant Abudher is the chief executive officer of Palladyne. Defendant Yeo is the chief corporate strategy and business development officer of Palladyne. They both "reside and maintain their principal place of business in the Netherlands." (Id. at 4.) They have never resided in Connecticut, had a place of business in Connecticut, or owned any real property or other assets in Connecticut. "In late March 2014, and in particular between March 25 (the date Plaintiff filed the employment action) and March 27 (the date the article was allegedly published), Abudher and Yeo were located in the Netherlands." (Id. at 4) (citations omitted).

■ When determining whether it has personal jurisdiction over a defendant, "the court must first look to the long-arm statute of the forum state ... If the exercise of jurisdiction is appropriate under that statute, the court must decide whether such exercise comports with the requisites of due process." Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir.2001) (quoting Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir.1997)).

There are two Connecticut long-arm statutes that may be applicable: Conn. Gen. Stat. § 52–59b(a), applying to foreign individuals and foreign partnerships, and Conn. Gen. Stat. § 33–929, applying to foreign corporations.

Section 52–59b(a) applies to the individual Milltown and Palladyne defendants. It also applies to Milltown because Milltown is organized as a partnership.[3] Palladyne is

---

3. The Complaint describes Milltown as a partnership, but it is more accurately described as a limited liability partnership ("LLP"). Conn. Gen. Stat. § 52–59b(a) also applies to LLPs.

See e.g., Harris v. Sunset Beach Villa Condominium Ass'n, Inc., No. FSTCV105013382S, 2010 WL 4942975, at *3 (Conn.Super.Ct. Nov. 15, 2010) (stating that personal jurisdic-

organized as a BV. It is not clear whether a BV is more analogous to a close corporation, see Boumatic, LLC v. Idento Operations, BV, 759 F.3d 790, 791 (7th Cir.2014) (concluding that a BV is more similar to a close corporation than to an LLC), in which case the corporate long-arm statute would apply, or an LLC, see IRS CCA 201032037 (Aug. 13, 2010) (stating that a BV is the equivalent of an American LLC), in which case the partnership long-arm statute would apply, see Matthews v. SBA, Inc., 149 Conn.App. 513, 546, 89 A.3d 938 (2014) (citing Austen v. Catterton Partners V, LP, 729 F.Supp.2d 548, 553–60 (D.Conn. 2010)) (§ 52–59b, rather than § 33–929, applies to foreign LLCs). The court does not need to decide which statute is applicable to a BV because it concludes that under either statute the court does not have personal jurisdiction over Palladyne.

### 1. Conn. Gen. Stat. § 52–59b(a)

Connecticut General Statutes § 52–59b(a) provides for jurisdiction over a nonresident individual or foreign partnership that:

> (1) Transacts any business within the state; (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; (3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the

state and derives substantial revenue from interstate or international commerce; (4) owns, uses or possesses any real property situated within the state; or (5) uses a computer, as defined in subdivision (1) of subsection (a) of section 53–451, or a computer network, as defined in subdivision (3) of subsection (a) of said section, located within the state.

Conn. Gen. Stat. § 52–59b(a) (West). Subsections (4) and (5) do not apply to the Milltown Defendants or the Palladyne Defendants because they do not own, possess, or use property in Connecticut, nor are they alleged to have used a computer or computer network in Connecticut.

Subsections (2) and (3) do not provide the court with personal jurisdiction over either the Milltown Defendants or the Palladyne Defendants because these subsections preclude personal jurisdiction over defamation claims. See e.g., Lego A/S v. Best–Lock Const. Toys, Inc., 886 F.Supp.2d 65, 72 (D.Conn.2012) ("subsections (a)(2) and (a)(3) specifically exclude from the statute's reach 'a cause of action for defamation of character'"); Irwin v. Mahnke, No. 5–cv–976, 2006 WL 691993, at *3 (D.Conn. Mar. 16, 2006) ("Under the plain language of this Connecticut long-arm statute, there is no personal jurisdiction over the Defendants because the alleged defamation occurred outside of Connecticut and the statute expressly excludes defamation claims.").

■■ The plaintiff argues that subsections (2) and (3) are unconstitutional because they infringe on his First Amendment right to petition. He argues that "[t]he right to petition incorporates the

---

tion over a limited liability partnership was governed by Conn. Gen. Stat. § 52–59b); UOP v. Andersen Consulting, No. CV95014753S, 1995 WL 784971 at *2 (Conn.Super.Ct. Dec.

21, 1995) (holding that a limited liability partnership is a partnership for purposes of Conn. Gen. Stat. § 52–59b).

right to litigate through the courts" and that exclusion of defamation claims from the long-arm statute infringes on his right to petition. (Plaintiff's Opposition at 33.) However, "[t]he right to petition exists in the presence of an underlying cause of action and is not violated by a statute that ... curtails a category of causes of action." City of New York v. Beretta U.S.A. Corp., 524 F.3d 384, 397 (2d Cir.2008). In addition, there is no requirement that state long-arm statutes "facilitate obtaining jurisdiction to the full extent permitted by [the Fourteenth Amendment]." See 2 ROBERT D. SACK, SACK ON DEFAMATION § 15:1.2[A] (4th ed. 2010); Best Van Lines, Inc. v. Walker, 490 F.3d 239, 245 (2d Cir. 2007) ("The defamation exceptions thus create a 'gap' between the jurisdiction conferred by the New York statute and the full extent of jurisdiction permissible under the federal Constitution.").

Therefore, the plaintiff's right to petition is not violated by subsections (2) and (3) of Conn. Gen. Stat. § 52–59b(a).

■ The plaintiff also contends that subsections (2) and (3) are unconstitutional because they violate the Equal Protection Clause of the Fourteenth Amendment by "restricting the rights of defamation plaintiffs as a class without using the least restrictive means." (Plaintiff's Opposition at 38.) Defamation plaintiffs are only entitled to rational basis review because the plaintiff has made no showing that defamation plaintiffs, as a category of persons, are a " 'discrete and insular' minority" entitled to heightened scrutiny. See Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). "Rational basis review places the burden of persuasion on the party challenging a law, who must disprove " 'every conceivable basis which might support it.' " " Windsor v. United States, 699 F.3d 169, 180 (2d Cir.2012) aff'd, — U.S. —, 133 S.Ct. 2675, 186

L.Ed.2d 808 (2013) (quoting Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973))). The plaintiff has failed to even offer an argument that there is no conceivable rational basis for the exclusion of a cause of action for defamation. Thus, the plaintiff's equal protection argument is unavailing.

Therefore, the court concludes that subsections (2) and (3) are not unconstitutional and that they do not provide for personal jurisdiction over either the Milltown Defendants or the Palladyne Defendants.

■ The plaintiff argues that subsection (1) may serve as a basis for personal jurisdiction over the Milltown Defendants and the Palladyne Defendants because they transacted business in Connecticut by making the defamatory statements affecting Friedman in Connecticut. However, Connecticut courts "do not favor subjecting an individual nonresident utterer of defamation, however hurtful or unfair, to long-arm jurisdiction by allowing the statute's broad and undefined concept of 'transacting business' to trump its explicit and unambiguous exclusions of long-arm jurisdiction for 'a cause of action for defamation of character.' " Lego A/S, 886 F.Supp.2d at 76; cf. Best Van Lines, Inc., 490 F.3d at 248 ("we do not understand New York courts to teach that the "gap" created by the defamation exceptions in sections 302(a)(2) and (3) is eliminated by the 'transact[ing] business' analysis. Some distance remains between the jurisdiction permitted by the Due Process Clause and that granted by New York's long-arm statute. New York courts do not interpret 'transact[ing] business' to include mere defamatory utterances sent into the state." (citations omitted) (alterations in original)). Therefore, subsection (1) does not provide the court with personal jurisdiction over

the Milltown Defendants and the Palladyne Defendants by virtue of the fact that their allegedly defamatory statements injured the plaintiff in Connecticut.[4]

The court concludes that § 52–59b does not provide this court with personal jurisdiction over either the Milltown Defendants or the Palladyne Defendants.

### 2. Conn. Gen. Stat. § 33–929

■ The plaintiff argues that Conn. Gen. Stat. § 33–929(f)(4) may also apply to this case. Section 33–929(f)(4) provides:

> Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: . . . (4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

Conn. Gen. Stat. § 33–929(f) (West). Section 33–929(f) does not apply to the individual defendants or Milltown because they are not corporations. Nor does § 33–929(f) provide the court with jurisdiction over Palladyne. Defamatory comments made outside Connecticut whose impact was felt within the state do not constitute "tortious conduct in this state" under § 33–929(f). See Amerbelle Corp. v. Hommell, 272 F.Supp.2d 189, 194 (D.Conn.2003) ("jurisdiction may be founded on § 33–929(f)(4) only if the tortious conduct occurred in Connecticut, regardless of

whether the injury was felt in Connecticut from tortious activity occurring outside Connecticut"). Therefore, § 33–929(f) does not provide the court with personal jurisdiction over Palladyne.

Since the Connecticut long-arm statutes do not permit personal jurisdiction over either the Milltown Defendants or the Palladyne Defendants, the court does not consider whether asserting personal jurisdiction over these defendants would comport with the due process requirements of the Fourteenth Amendment. See Best Van Lines, Inc., 490 F.3d at 242 ("if, but only if, [state law provides for personal jurisdiction over the defendant], we must then determine whether asserting jurisdiction under that provision would be compatible with the requirements of due process established under the Fourteenth Amendment to the United States Constitution" (emphasis added)).

Accordingly, the motions to dismiss for lack of personal jurisdiction by the Milltown Defendants and the Palladyne Defendants are being granted.

### B. Count I—Defamation

Because the court concludes that it does not have jurisdiction over either the Milltown Defendants or the Palladyne Defendants, the analysis of Counts I and II is limited to the Bloomberg Defendants only.

The court concludes that New York law applies here and that, under New York law, with respect to the statement concerning as much as $500 million in damages, the Bloomberg Defendants are shielded from liability by the judicial proceedings privilege, and that the statement concern-

---

4. The plaintiff filed a motion for jurisdictional discovery to determine whether the Palladyne Defendants and the Milltown Defendants transact any business in Connecticut, for purposes of both § 52–59b(a) and § 33–929. (See Plaintiff's Motion for Jurisdictional Discovery and Enlargement of Time to File Amended Complaint (Doc. No. 56).) As the court stated during a telephonic status conference held on October 2, 2015, (see Doc. No. 62), the plaintiff has not made a showing that jurisdictional discovery in this case is justified.

ing the plaintiff repeatedly trying to extort money was not defamatory because of the context in which it was made.

### 1. Choice of Law

In a diversity case, a federal court must look to the law of the forum state for the rules governing choice of law. See Klaxon Co. v. Stentor Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Connecticut has adopted the Restatement (Second) of Conflict of Laws' "most significant relationship" test for choice of law. See O'Connor v. O'Connor, 201 Conn. 632, 650, 519 A.2d 13 (1986). In accordance with this test, a court must apply the substantive law of the state with the "most significant relationship to the occurrence and the parties under the principles stated in § 6." Id. (quoting Restatement (Second) of Conflict of Laws § 145.)

The contacts to be considered when applying the § 6 principles include:

(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145(2) (1971). In this case, the injury occurred in Connecticut (and arguably New York), and the conduct causing the injury took place in New York. The plaintiff is domiciled in Connecticut, and Bloomberg's principal place of business is New York. Defendants Dolmetsch, Larsen, and Dunn work at Bloomberg in New York, and defendant Hytha works at Bloomberg in California. There is no alleged relationship between the parties for purposes of § 145(2)(d).

Section 6 provides:

the factors relevant to the choice of the applicable rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and, (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

The tort of defamation exists to protect the reputation of individuals and entities. Accordingly, "[w]hen a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state" because that is ordinarily where the injury to the person's reputation is most significantly felt. Restatement (Second) of Conflict of Laws § 150 (1971).

On the other hand, the tort of defamation also implicates freedom of speech. See Davis v. Costa–Gavras, 580 F.Supp. 1082, 1093 (S.D.N.Y.1984) ("libel is a tort with widespread implications for interests of individual free expression and dissemination of ideas, and involves balancing the plaintiff's need for compensation against these competing interests").

In this respect, libel is less plaintiff-centered than other torts, and rules on vicarious liability or statutes of limitation may reflect a state's concern to regulate without chilling defendants' conduct. Strong policy reasons exist for deciding issues whose major impact is

on the behavior of potential defendants according to the rules of the jurisdiction where the conduct that gives rise to liability takes place, especially when that conduct may be protected speech.

Id. (citation omitted). In assessing the states' policies towards defamations claims, the court notes that a New York statute provides a judicial proceedings privilege and that Connecticut has a similar common law protection.

In AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266 (2d Cir.1992), the court engaged in a choice of law analysis to determine whether to apply California or Connecticut law to a defamation case. The court noted that California's judicial proceedings privilege, provided for by statute, was broader than Connecticut's. In concluding that California law should apply, the court observed:

> The judicial-proceeding privilege would lose its force if weight were given to the domicile of the parties or the place of injury in determining choice of law. Were the law of some other state to be applied in the case of California's judicial-proceeding privilege, for example, the incentive of parties to California litigation to rely upon that privilege would be gravely undermined because they cannot ensure that ensuing tort litigation will occur in California. To the contrary, they can be sure that, if the law of, say, the forum state, were to be applied, plaintiffs would always bring the actions in a forum with a narrow privilege. We must, therefore, apply the law of the locus state.

AroChem, 968 F.2d at 271.

In this case, neither the Bloomberg defendants nor Friedman argues that Connecticut law should be applied, and they take the position that the law of defamation in the two states is "substantially similar." (See Plaintiff's Opposition at 8 ("the defamation claims may be subject to the law of New York ... or Connecticut, but for the primary issues here there is no material difference, therefore New York law should apply"); Bloomberg's Memorandum of Law in Support of Motion to Dismiss (Doc. No. 38–1) ("Bloomberg Memorandum") at 11 n. 9 ("Friedman appears to acknowledge that New York law applies to his claim against Bloomberg... In any event, the relevant law in both states is substantially similar—the privilege protects the Article and precludes a claim against Bloomberg—and this Memorandum will refer primarily to New York cases and supply Connecticut authority for the same principles."))

██ Weighing the relevant § 6 principles, the court concludes that New York law should be applied in this case. Although the plaintiff's domicile is in Connecticut, he asserts that the injury to his reputation will negatively impact his job search in both Connecticut and New York. The court also considers the fact that Bloomberg's principal place of business is in New York, the fact that most of the individual Bloomberg defendants work in New York, and the fact that New York has provided by statute a judicial proceedings privilege that could be diluted by applying a forum state's law. Because the plaintiff has not alleged facts showing that his injury was more significantly felt in Connecticut, because he has not provided any reason to apply Connecticut law, and because policy factors weigh in favor of applying New York law, the court applies New York law.

██ To state a claim for defamation under New York law, a plaintiff must allege:

> (1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through

fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused "special damages." Tannerite Sports, LLC v. NBCUniversal Media LLC, No. 15–CV–2343 SAS, 2015 WL 5783811, at *6 (S.D.N.Y. Oct. 1, 2015) (quoting Gargiulo v. Forster & Garbus, Esqs., 651 F.Supp.2d 188, 192 (S.D.N.Y. 2009)).

### 2. The Alleged Defamatory Statements

#### a. Statement re as Much as $500 Million Damages

 The first allegedly defamatory statement at issue here is the statement that "Dutch hedge fund Palladyne International Asset Management BV was sued in the U.S. for as much as $500 million by a former executive." (Complaint, Ex. 1 (Doc. No. 1–1) at 2.) The plaintiff alleges this statement was defamatory because his "base claim" was $44,941,000, not $500 million.

The Bloomberg Defendants argue that New York's "judicial proceedings privilege" shields them from liability on this part of the plaintiff's defamation claim. The court agrees.

Under New York law:

A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

N.Y. Civ. Rights Law § 74 (McKinney).

 First, the article was about a judicial proceeding. The article predominantly reports on the contents of the complaint in the employment case, citing to and quoting from it throughout the article. "Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within § 74's privilege." Lan Sang v. Ming Hai, 951 F.Supp.2d 504, 521 (S.D.N.Y.2013). The as much as $500 million statement, in particular, was a summary of the plaintiff's prayer for relief, and therefore falls within § 74's privilege, provided that the report is fair and true. The court concludes that it is.

A statement is deemed a fair and true report if it is "substantially accurate." Karedes v. Ackerley Group, Inc., 423 F.3d 107, 119 (2005) (citations omitted). "A report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." Id. (citations omitted). Sang, 951 F.Supp.2d at 520.

The complaint in the employment case states:

WHEREFORE, the plaintiff asks the Court to enter judgment on all Counts for the plaintiff as follows:

Count I: Fraudulent Inducement: judgment in the amount of $44,991,000, plus interest and attorneys' fees and costs . . .

Count II: Declaratory Judgment . . .

Count III: Promissory estoppel: judgment for Friedman in the amount of $44,991,000, plus interest and attorneys' fees and costs.

Count IV: Racketeering Influenced and Corrupt Organizations Act: judgment for the benefit of the plaintiff's bargain as well as damages from harm to his career in the financial services industry: for two years of foregone salary and bonus, ($1,500,000), and loss of career ($44,991,000) trebled under 18 U.S.C. sec. 1964(c) to a total of $139,473,000, plus attorneys' fees and costs;

Count V: Connecticut Unfair Trade Practices Act: (1) $134,973,000 (three times career income losses) for damages to Friedman's financial career, (2) judgment against SThree Group for the revenues it has received from Palladyne and (3) an injunction . . . .

Count VI: Punitive Damages: judgment for three times Friedman's career income losses, or $134,973,000;

Count VII: Declaratory Judgment . . .

(Employment Complaint ¶¶ 50–51) (emphasis added).

Read literally, the request for relief asks the court to enter judgment on all counts, not one count and in the alternative a certain other count or other counts, and the sum of the amounts requested in Counts I, III, IV, V, and VI is $499,401,000. The plaintiff also requests attorneys' fees and costs and disgorgement of SThree Group's commission income from Palladyne.

 The plaintiff alleges that the statement concerning as much as $500 million is inaccurate because some of the claims in the employment complaint are pled in the alternative, and the alternative claims cannot be aggregated. He argues that because the reporters and editors "were part of a legal reporting team and fully familiar with the Federal Rules of Civil Procedure and its provisions for alternative pleading[,] . . . . they knew or should have known that alternative theories of recovery do not allow for cumulative damages and that Friedman's Inducement Case did not contain a claim for $500,000,000 in damages." (Complaint ¶¶ 90–91.) Reporters, however, are not required to parse through a complaint to determine which claims are valid, which are duplicative, and what relief the plaintiff might be entitled to as a prerequisite to being shielded from liability by the judicial proceedings privilege. Cf. Becher v.

Troy Pub. Co., 183 A.D.2d 230, 589 N.Y.S.2d 644 (1992) ("In applying the statutory standard to press coverage of legal proceedings, it was stated that: 'Newspapers cannot be held to a standard of strict accountability for use of legal terms of art in a way that is not precisely or technically correct by every possible definition. Were it otherwise, the narrow and confining application of the libel laws would entirely defeat the purposes of . . . statutes like section 74 of the Civil Rights Law · . . . Hence, in areas of doubt and conflicting considerations, it is almost always preferable to err on the side of free expression[.]' " (quoting Gurda v Orange Cty. Publs. Div. of Ottaway Newspapers, 81 A.D.2d 120, 133, 439 N.Y.S.2d 417 (1981) [Mollen, P. J., and Titone, J., concurring in part and dissenting in part], revd on concurring and dissenting opn below 56 N.Y.2d 705, 708, 451 N.Y.S.2d 724, 436 N.E.2d 1326 (1982))).

While the statement concerning as much as $500 million was not a fair and true statement of the damages the plaintiff could seek in the employment case, it was a fair and true statement of what was written in the plaintiff's complaint in the employment case. Although the plaintiff argues that the claims are pled in the alternative, there is no language to that effect in the complaint. What was being reported on here was the plaintiff's claims as described in the complaint in the employment case, and the article was a fair and true report of what was in that complaint. To the extent there was an inaccuracy here, it is found in the language used in the prayer for relief. Therefore, the court concludes that this statement is privileged.

 The plaintiff contends that discovery is needed to determine whether the Bloomberg Defendants' information was

derived from the complaint or from a Palladyne source. However, "once it is established that the publication is reporting on a judicial proceeding, how a reporter gathers his information concerning a judicial proceeding is immaterial provided his [or her] story is a fair and·substantially accurate portrayal of the events in question." Id. (quoting Cholowsky v. Civiletti, 69 A.D.3d 110, 887 N.Y.S.2d 592, 596 (2009)). Here, the court has concluded that the Bloomberg Defendants were reporting on a judicial proceeding and that the statement concerning as much as $500 million was a fair and true report of the plaintiff's pleading. Thus, it is unnecessary to determine whether the Bloomberg Defendants' source was the complaint itself or another party.

Therefore, Count I, as it pertains to this statement, is being dismissed.

### b. Statement re Repeatedly Tried to Extort Money

#### (i) Judicial Proceedings Privilege

▮▮▮▮▮ The Bloomberg Defendants also contend that "the quotation of Palladyne's statement that Friedman tried to 'extort money'·from the company is protected as a fair and accurate report of Palladyne's response to the charges in the Employment Action." (Bloomberg Memorandum at 18.) The plaintiff argues that this statement is not within the scope of the judicial proceedings privilege. The court agrees with the plaintiff.

[W]hile [the] privilege covers communications adjunct or preparatory to legal proceedings ... "during the course of the proceeding" does not mean, as defendants appear to suggest, that the privilege extends to any statement made in any forum while a proceeding is pending that relates to the same subject matter as the proceeding. "The privilege is usually understood as not applying ... to out-of-court statements made to persons not related to the litigation." Rodney Smolla, Law of Defamation, § 8:9 at 8–12.4 (2d ed.2005). See Sack on Defamation, § 8.2.1 at 8–19 ("[S]tatements made by parties to litigation to the public, during the course of press conferences, for example, ... are not privileged."); see also Schulman v. Anderson Russell Kill & Olick, 117 Misc.2d 162, 458 N.Y.S.2d 448, 453 (1982) (finding a law firm not entitled to absolute privilege with respect to a letter sent to persons unconnected to the lawsuit).

Long v. Marubeni Am. Corp., 406 F.Supp.2d 285, 294 (S.D.N.Y.2005). In other words, statements made to the press, like those made by Palladyne to the Bloomberg Defendants, are not automatically privileged simply because they are made about a legal proceeding. Rather, "[o]ut-of-court statements such as press releases, which are not covered by the litigants' privilege, are privileged only to the extent that they represent fair and true reports of what occurred in the proceeding ..." Id. (emphasis added). In this case, Palladyne's statement was issued before it had even appeared in the employment case. Therefore, the court cannot conclude that Bloomberg's publication of the statement is a "fair and true report[ ] of what occurred in the proceeding." Id. (emphasis added). It is possible that Palladyne may endorse the statement concerning the plaintiff repeatedly trying to extort money in a pleading, in which case the statement may then·become privileged. See Hudson v. Goldman Sachs, 304 A.D.2d 315, 316, 757 N.Y.S.2d 541 (2003) ("This Court's prior order did not hold, as plaintiff contends, that defamatory statements contained in reports of judicial proceedings published before joinder of issue are not privileged under Civil Rights Law § 74. Rather, at that time, it could not be said

that the newspaper article was a substantially accurate report of defendant's position in this lawsuit before defendant had taken a position, not in an unsworn brief but in something more formal and binding such as a pleading.").

The Bloomberg Defendants argue that the reasoning in Hudson should not be applied to a media defendant like Bloomberg because it has "no control over the timing or content of the parties' pleadings" and "if Bloomberg were required to wait until joinder of issue before informing the public of the parties' contentions, fair reporting on the case would be effectively silenced and the public's right to know would be undermined." (Bloomberg Memorandum at 19–20 n. 19) (citing Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co., 49 N.Y.2d 63, 68, 424 N.Y.S.2d 165, 399 N.E.2d 1185 (1979) ("newspaper accounts of legislative or other official proceedings must be accorded some degree of liberality"); McNally v. Yarnall, 764 F.Supp. 853, 856 (S.D.N.Y. 1991) (privilege protects out-of-court comments "relate[d] directly to a possible position to be taken ... as a defense in the future")).

The court disagrees. There is a significant distinction between a "judicial proceedings privilege" (also known as a "fair reporting privilege") and a "reporting on a case privilege." In Long, the court discussed the evolution of New York's judicial proceedings privilege and the distinction between it and the litigant's privilege. The following part of that discussion is relevant to the analysis here:

> At common law, as adopted in New York as early as 1850, "words spoken or written in a judicial proceeding by a party to that proceeding could not provide the basis of a cause of action for libel." Williams [v. Williams], 23 N.Y.2d [592] at 600, 298 N.Y.S.2d 473, 246

N.E.2d 333 [ (1969) ], citing Garr v. Selden, 4 N.Y. 91 (1850). This privilege was absolute, and thus, "a party had an absolute right to say anything in a judicial proceeding, without fear of committing a libel, in accord with a general policy of encouraging the use of the courts." Id.

> In contrast, the statute which was first adopted in 1854 that evolved into § 74 "was not intended to, and did not, alter the common-law protection afforded litigants. Rather, the enactment recognized another common-law rule which created a qualified privilege—rendered inapplicable by showing actual malice— for a fair and true report of a judicial proceeding by a [journalist]." Id. at 601, 298 N.Y.S.2d 473, 246 N.E.2d 333. In 1930, this privilege also became absolute, and in 1940 it was extended to "all persons." Id. ... "The purpose of the 1940 amendment ... was to extend to all disinterested persons the privilege then possessed by the press—to publish true and fair reports of judicial proceedings without fear of liability." Williams, 23 N.Y.2d at 603, 298 N.Y.S.2d 473, 246 N.E.2d 333. For litigants, the traditional privilege to speak or write during the court proceedings was sufficient protection.

The leading treatise on defamation reaches similar conclusions. Parties to litigation have an "absolute privilege ... for defamatory statements made prior to, in the institution of, or during the course of, a proceeding." Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems ("Sack on Defamation"), § 8.2.1.4 at 8–14 (2004). However, while this privilege covers communications adjunct or preparatory to legal proceedings such as communications to an attorney, id. "during the course of the proceeding" does not mean, as defendants appear to suggest, that the privilege extends to any state-

ment made in any forum while a proceeding is pending that relates to the same subject matter as the proceeding. "The privilege is usually understood as not applying ... to out-of-court statements made to persons not related to the litigation." Rodney Smolla, Law of Defamation, § 8:9 at 8–12.4 (2d ed.2005). See Sack on Defamation, § 8.2.1 at 8–19 ("[S]tatements made by parties to litigation to the public, during the course of press conferences, for example, ... are not privileged."); see also Schulman v. Anderson Russell Kill & Olick, 117 Misc.2d 162, 458 N.Y.S.2d 448, 453 (1982) (finding a law firm not entitled to absolute privilege with respect to a letter sent to persons unconnected to the lawsuit).

The privilege for in-court statements is considerably broader in scope than that for out-of-court reports relating to the proceedings. The former are covered as long as the inference has some bearing on the litigation. Restatement (Second) of Torts § 587 (1977). Out-of-court statements such as press releases, which are not covered by the litigants' privilege, are privileged only to the extent that they represent fair and true reports of what occurred in the proceeding (subject to the Williams exception for a party's out-of-court repetition of a maliciously false statement in a pleading). Long, 406 F.Supp.2d at 293–94 (emphasis in original). The Bloomberg Defendants seek an unwarranted extension of § 74's judicial proceedings privilege in that they seek to apply the privilege to a statement that lacks the requisite nexus with a judicial proceeding.

It is immaterial that Bloomberg was simply publishing Palladyne's statement because "[i]t has long been the rule that one who republishes a libel is guilty of libel. Hence, the defamatory meaning of

the statement is not changed by its attribution to others." Levin v. McPhee, 917 F.Supp. 230, 237 (S.D.N.Y.1996) aff'd, 119 F.3d 189 (2d Cir.1997); see also Cianci v. New Times Pub. Co., 639 F.2d 54, 61 (2d Cir.1980)(" '(t)he law affords no protection to those who couch their libel in the form of reports or repetition ... the repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement' ... The republication rule applies to the press, as it does to others ... Any different rule would permit the expansion of a defamatory private statement, actionable but without serious consequences, into an article reaching thousands of readers, without liability on the part of the republisher." (quoting Olinger v. Am. Sav. & Loan Assoc., 409 F.2d 142, 144 (D.C.Cir.1969))).

### (ii) Defamatory Nature of the Statement

■ The plaintiff alleges that the statement is "libel per se as it accused Friedman of having repeatedly engaged in felonious conduct." (Complaint ¶ 74.) The Bloomberg Defendants argue that the statement is not defamatory because a reasonable reader would not understand Palladyne to be suggesting that the plaintiff was repeatedly committing the crime of extortion.

■ As a matter of law, "[e]xpressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." Melius v. Glacken, 94 A.D.3d 959, 943 N.Y.S.2d 134, 135 (2012).

In determining whether a statement constitutes a nonactionable opinion, a question of law for the court, the "factors to be considered are: (1) whether the specific language in issue has a precise meaning which is readily under-

stood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact."

Melius, 943 N.Y.S.2d at 135–36 (quoting Brian v. Richardson, 87 N.Y.2d 46, 637 N.Y.S.2d 347, 350, 660 N.E.2d 1126 (1995)). "Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff.'" Brian, 87 N.Y.2d at 51, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (quoting Immuno AG. v. Moor–Jankowski, 77 N.Y.2d 235, 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991)).

The Bloomberg Defendants argue that the statement concerning extortion is a non-actionable opinion. They contend that "[i]t is clear from the face of the Article that Palladyne's statement expressed the company's view that Friedman was advancing unmeritorious claims." (Bloomberg Memorandum at 25.) Citing a number of New York defamation cases, the Bloomberg Defendants assert, "[t]he words 'extort' and 'extortion' are used so often by defendants in similar circumstances that courts have repeatedly ruled that readers recognize them as expressions of opinion that the lawsuits are baseless and motivated by greed, not assertions that the plaintiffs have committed a crime." (Id.) (citing G & R Moojestic Treats, Inc. v. Maggiemoo's Int'l, LLC, No. 03 Civ. 10027(RWS), 2004 WL 1172762, *2 (S.D.N.Y. May 27, 2004) ("[c]onsidering the context ... in an article describing the lawsuit against [defendant], no reasonable reader could understand [the] statements as saying that plaintiff committed the criminal act of extortion." (internal quotes and citation omitted)); Sabharwal & Finkel, LLC v. Sorrell, 117 A.D.3d 437, 985 N.Y.S.2d 70, 70 (2014) (the statement that lawyers had "broached the topic of settlement ... in an attempt to 'extort' money" would be understood by reasonable readers to "convey non-actionable opinions about the merits of the lawsuit and the motivation of [the] attorneys, rather than statements of fact."); Trustco Bank of New York v. Hearst Corp., 213 A.D.2d 940, 624 N.Y.S.2d 291, 294 (1995) (use of "extortion" to describe lawsuit, quoted in newspaper article, protected as opinion); Melius, 943 N.Y.S.2d at 136–37 (N.Y.App.Div.2012) ("extortionist")).

The plaintiff argues that the use of the word "repeatedly" in Palladyne's statement distinguishes this case from those cited by the Bloomberg Defendants because it suggests that "Palladyne claimed access to 'implied facts' to support what it said, facts not known to the reader but known to Palladyne. Further, by using the word 'repeatedly,' Palladyne was obviously not referring to the suit just filed." (Plaintiff's Opposition at 17.) The plaintiff relies primarily on Grande v. Gristede's Food's Inc., No. 11–cv–777, 2011 WL 4716339 (S.D.N.Y. Oct. 7, 2011). In Grande, a former employee sued his former employer. After the lawsuit was filed, the employer gave an interview to the New York Post discussing the case. The New York Post published an article stating, "[the employer] also said [the plaintiff] tried to extort $2 million from the company." Grande, 2011 WL 4716339 at *2. The plaintiff alleged that the statement was "defamation per se, as it accuse[d] him of serious criminal conduct, and that it [was] an attack on his character and integrity." Id. The defendant argued that the statement was "a

statement of opinion" and was "merely rhetoric in response to the instant litigation, which a reasonable reader would understand as such." Id. at *3. The court found for the plaintiff, concluding that "[the employer's] comment can be interpreted in a number of different ways. For instance, one interpretation is that [the plaintiff] tried to extort money from the Company in the past, and was fired as a result." Id.

The court considers Palladyne's statement in the context in which it was made and concludes that the statement is not an actionable statement of fact. The court finds the Supreme Court's reasoning in Greenbelt Co-op. Pub. Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), to be helpful here. In Greenbelt, the Supreme Court considered a case in which a newspaper published an article describing public meetings in a local community. The newspaper reported that some people at the meeting had characterized a local real estate developer's negotiating position as "blackmail." The real estate developer sued, alleging libel on the grounds that "the speakers at the meeting, in using the word 'blackmail,' and the petitioners in reporting the use of that word in the newspaper articles, were charging [the developer] with the crime of blackmail, and that since the [newspaper] knew that [the developer] had committed no such crime, they could be held liable for the knowing use of falsehood." Greenbelt, 398 U.S. at 13, 90 S.Ct. 1537.

The Court found that the statements were not defamatory, reasoning as follows:

It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was [the developer's] public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging [the developer] with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought [the developer] had been charged with a crime.

Id. at 14, 90 S.Ct. 1537.[5]

In Greenbelt, the overall context of the statements about "blackmail" informed the Court's conclusion that no reader would understand the use of the term to be implying that the developer was, in fact, committing the crime of blackmail. Here, the overall context in which Palladyne's statement was made leads the court to conclude that a reasonable reader would not understand Palladyne's statement to be suggesting that the plaintiff had engaged in a pattern of felonious conduct, as opposed to suggesting that the claim was frivolous.

Palladyne's statement about extortion comes at the end of the news article, most of which is devoted to quoting and citing to the plaintiff's allegation that Palladyne was

**5.** The Court commented that "the articles published in the petitioners' newspaper were accurate and truthful reports of what had been said at the public hearings before the city council" and went on to hold that the statements were not slander when spoken or libel when reported. Greenbelt, 398 U.S. at 12, 90 S.Ct. 1537. This case is materially different because the court concludes that, unlike the Greenbelt News Review, Bloomberg was not reporting on an official proceeding. The court, therefore, relies on Greenbelt only for its analysis of whether the statements were defamatory.

laundering money for Muammar Qaddafi in exchange for kickbacks. The article concludes with two statements in response by two of the defendants in the employment case—one by a Palladyne representative and one by an SThree representative. Palladyne's statement, in context, is as follows:

"These entirely untrue and ludicrous allegations have been made by a former employee who has repeatedly tried to extort money from the company," Palladyne said in an e-mail statement today. "He worked with us for just two months before being dismissed for gross misconduct."

(Complaint, Ex. 1 at 3.) A reasonable reader would understand the use of the word "extort" to be "rhetorical hyperbole, a vigorous epithet" and the statement to reflect Palladyne's belief that an upset former employee had filed a frivolous lawsuit against Palladyne in order to get money. See e.g., G & R Moojestic Treats, Inc., 2004 WL 1172762 at *2 ("[c]onsidering the context of [the CEO's] statements in an article describing the lawsuit against [the CEO's company], 'no reasonable reader could understand [the CEO's] statements as saying that plaintiff committed the criminal act of extortion.' ").

Accordingly, the court concludes that Palladyne's statement was a nonactionable vigorous epithet, not a libelous statement of fact, and Count I, as it pertains to this statement, is being dismissed.

\* \* \* \* \*

Because the plaintiff has failed to state a claim for defamation as to either of the statements at issue, Count I is being dismissed in its entirety.

### C. Count II—Punitive Damages

In Count II, the plaintiff seeks punitive damages based on the alleged defamatory actions of the defendants. How-

ever, "there is no separate cause of action in New York for punitive damages." Martin v. Dickson, 100 Fed.Appx. 14, 16 (2d Cir.2004). Accordingly, Count II is being dismissed for failure to state a claim upon which relief can be granted.

## IV. CONCLUSION

For the reasons set forth above, Milltown Defendants' Amended Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2) and 12(b)(6) (Doc. No. 59) and Palladyne Defendants' Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2) and 12(b)(6) (Doc. No. 43) are hereby GRANTED, and Bloomberg's Motion to Dismiss (Doc. No. 38) is also hereby GRANTED.

The Clerk shall enter judgment in favor of the defendants and close this case.

It is so ordered.